[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11815

_____

D.C. Docket Nos. 1:09-md-02106-ASG, 1:09-cv-23835-ASG

AVENUE CLO FUND, LTD.,
et. al.,

Plaintiffs,

AVENUE CLO IV, LTD.,
AVENUE CLO V, LTD.,
AVENUE CLO VI, LTD.,
BRIGADE LEVERAGED CAPITAL STRUCTURES FUND, LTD.,
BATTALION CLO 2007-I LTD.,
CASPIAN CAPITAL PARTNERS, L.P.,
CASPIAN SELECT CREDIT MASTER FUND, LTD.,
ING PRIME RATE TRUST,
ING SENIOR INCOME FUND,
ING INTERNATIONAL (II) -SENIOR BANK LOANS EURO,
ING INVESTMENT MANAGEMENT CLO I, LTD.,
ING INVESTMENT MANAGEMENT CLO II, LTD.,
ING INVESTMENT MANAGEMENT CLO III, LTD.,
ING INVESTMENT MANAGEMENT CLO IV, LTD.,
ING INVESTMENT MANAGEMENT CLO V, LTD.,
VENTURE II CDO 2002, LIMITED,
VENTURE III CDO LIMITED,
VENTURE IV CDO LIMITED,
VENTURE V CDO LIMITED,
VENTURE VI CDO LIMITED,
VENTURE VII CDO LIMITED,
VENTURE VIII CDO LIMITED,
VENTURE IX CDO LIMITED,
VISTA LEVERAGED INCOME FUND,

VEER CASH FLOW CLO, LIMITED,
MARINER LDC,
GENESIS CLO 2007-1 LTD.,
CANPARTNERS INVESTMENTS IV, LLC,
SCROGGIN CAPITAL MANAGEMENT II,
SCROGGIN INTERNATIONAL FUND LTD.,
SCROGGIN WORLDWIDE FUND LTD.,
CASPIAN ALPHA LONG CREDIT FUND, L.P.,
SOLA LTD,
MONARCH MASTER FUNDING, LTD.,
SOLUS CORE OPPORTUNITIES MASTER FUND LTD.,
CANTOR FITZGERALD SECURITIES,
OLYMPIC CLO I, LTD.,
SHASTA CLO I, LTD.,
WHITNEY CLO I LTD.,
SAN GABRIEL CLO I LTD.,
SIERRA CLO II LTD.,
NORMANDY HILL MASTER FUND, L.P.,

SPCP GROUP, LLC,
VENURE CAPITAL MASTER FUND, LTD.,

          Plaintiffs - Appellants,

versus

SUMITOMO MITSUI BANKING CORPORATION,
et al.,

          Defendants,

BANK OF AMERICA, NA,

          Defendant - Appellee.
    _____

Appeal from the United States District Court
for the Southern District of Florida
_____
(July 26, 2013)

2

Before TJOFLAT and MARTIN, Circuit Judges, and BUCKLEW, [*] District Judge.

MARTIN, Circuit Judge:

This case is one of many resulting from the failure of the project to build a Fontainebleau Resort in Las Vegas.  The Fontainebleau Las Vegas was a hotel and casino development project on an approximately 24.4 acre parcel at the north end of the Las Vegas Strip.  Here, a group of lenders and their successors in interest (Term Lenders) appeal the District Court's grant of summary judgment in favor of Bank of America.  See In re Fontainebleau Las Vegas Contract Litigation MDL No. 2106, No. 09-MD-02106-CIV, 2012 WL 930290, *1 (S.D. Fla. March 19, 2012).  After careful review, and with the benefit of oral argument, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.  FACTUAL BACKGROUND

This case is a contract dispute related to the funding of the development of the Fontainebleau Las Vegas (the Project).  See In re Fontainebleau, 2012 WL 930290, at *1–49.  On one side of the dispute are the Term Lenders, which loaned money to Fontainebleau Las Vegas, LLC and Fontainebleau Las Vegas II, LLC (the Borrowers).  The Borrowers' parent company, Fontainebleau Resorts, LLC, was the developer of the Fontainebleau Las Vegas.  On the other side of the

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

3

dispute is Bank of America, which was the Disbursement Agent responsible under the funding agreements for disbursing the Term Lenders' funds to the Borrowers.

## A.  THE FUNDING STRUCTURE

At the beginning, the Project's budget was $2.9 billion, with $1.85 billion to be funded by a senior secured debt facility (Senior Credit Facility).[1]  The Senior Credit Facility was set up by the Credit Agreement and consisted of three components: a $700 million Initial Term Loan Facility; a $350 million Delay Draw Term Loan Facility; and an $800 million Revolving Loan Facility.

The Term Lenders own Initial Term Loan and Delay Draw Term Loan notes.  The Initial Term Loans were due on the closing date.  The Delay Draw Term Loans and Revolving Loans were disbursed on a periodic basis under the terms of the Disbursement Agreement.  Bank of America was the Disbursement Agent responsible for distributing the funds under the terms of the Disbursement Agreement.

## B.  DISPERSING THE MONEY

The process set up for the Borrowers to get the money had a lot of moving parts. The Credit Agreement required the Borrowers to first submit a Notice of Borrowing to the Administrative Agent (Bank of America).  This would prompt

---

[1] The balance of the Project was funded by a $675 million Second Mortgage Note offering and a $400 million Retail Facility.  The Retail Facility was the sole source of funding for the retail portion of the Fontainebleau Las Vegas.  The resort budget included $83 million in costs that were to be funded through the Retail Facility.

the Term Lenders and/or Revolving Lenders to give the money to the Administrative Agent. If the Notice of Borrowing included the proper information and the Borrowers submitted no more than one Notice per month, the Administrative Agent would transfer the loan funds into the Bank Proceeds Account. One difference between the Delay Draw Term Loans and Revolving Loans was that "the proceeds of each Delayed Draw Term Loan [was] applied <u>first</u> to repay in full any then outstanding Revolving Loans . . . and <u>second</u>, to the extent of any excess, [was] credited to the Bank Proceeds Account."

Once funds were in the Bank Proceeds Account, the Borrowers had to submit another request, called the Advance Request, which included a series of general representations and certifications, to the Disbursement Agent (Bank of America). When it received the Advance Request, Bank of America, as Disbursement Agent, as well as the Construction Consultant were required to review the Advance Request and determine whether all the required documentation was provided. The Construction Consultant was also required to deliver a certificate to Bank of America either approving or disapproving the Advance Request.

Under the Disbursement Agreement, the next step turned on whether the conditions precedent set forth in Article 3 of the Disbursement Agreement were

5

satisfied.[2]  If the conditions precedent were met, Bank of America, in its role as Disbursement Agent, was required to execute an Advance Confirmation Notice and the funds would be disbursed to the Borrowers.  If, on the other hand, the conditions precedent were not met then Bank of America was required to issue a Stop Funding Notice.  Bank of America's duties as Disbursement Agent, with respect to determining whether the conditions precedent were or were not satisfied, is one of the disputes between the parties that will be the subject of our discussion in Part IV.A of this Order.

### C.  MONEY DISPERSED DURING THE TIME IN DISPUTE

For each Advance Request from September 2008 through March 2009, Bank of America, as Disbursement Agent, received the required Advance Request certifications from the Borrowers, the Construction Consultant, the contractor, and the architect.  Throughout this period Bank of America continued to disburse funds to the Borrowers and never issued a Stop Funding Notice.

However, the Term Lenders have pointed to a number of events, beginning in September 2008, which they say "caused the failures of multiple conditions precedent."  They delineate these events as: "the Lehman bankruptcy and the

---

[2] The conditions included, for example, that "[n]o Default or Event of Default shall have occurred and be continuing"; "there shall not have occurred any change in the economics or feasibility of constructing and/or operating the Project, or in the financial condition, business or property of Fontainebleau, any of which could reasonably be expected to have a Material Adverse Effect"; and "the Retail Agent and the Retail Lenders shall . . . make any Advances required of them."  Other conditions that the parties believe are relevant to this case are set forth in §§ 3.3.2, 3.3.8, 3.3.21, and 3.3.24 of the Disbursement Agreement.

6

funding of the Retail Facility; Fontainebleau's failure to disclose anticipated Project costs; repudiation by the FDIC of First National Bank of Nevada's commitments; select lenders' failure to fund with respect to the March 2009 Advance; and the 'untimely' submission of the March 2009 Advance." See In re Fontainebleau, 2012 WL 930290, at *15. How much Bank of America knew about these events is another source of dispute between the parties. That dispute will be the subject of our discussion in Part IV.B of this Order.

In April 2009, the "Total Revolving Commitments" were ended because the Revolving Lenders determined that there had been Events of Default. In May 2009, Bank of America commissioned a "cost-complete review" of the Project, which revealed that Fontainebleau had been concealing cost overruns. Finally, on June 9, 2009, the Borrowers and some of their affiliates filed for bankruptcy.

## II.  PROCEDURAL HISTORY

On January 15, 2010, the Term Lenders filed a Second Amended Complaint alleging, as relevant to this appeal, that Bank of America breached the Disbursement Agreement.[3] Following discovery, the parties filed cross-motions for summary judgment.

---

[3] The Complaint also alleged breach of the Credit Agreement, breach of the implied covenant of good faith and fair dealing, and requested declaratory relief.

The District Court granted summary judgment in favor of Bank of America because it determined that "the Term Lenders, with all inferences in their favor, have failed to raise a genuine issue of material fact as to whether Bank of America, as Disbursement Agent or Bank Agent, breached the Disbursement Agreement, or whether Bank of America acted with bad faith, gross negligence, or willful misconduct." In re Fontainebleau, 2012 WL 930290, at *26.  In reaching that conclusion, the District Court made several preliminary findings.  First, the District Court held that "[i]n determining whether the conditions precedent to an Advance Request were satisfied, Bank of America was explicitly authorized to rely on Fontainebleau's certifications . . . and was explicitly not required to conduct 'any independent investigation as to the accuracy, veracity, or completeness' of those certifications." Id. at *28.  Second, the District Court determined that "Bank of America, as Disbursement Agent, did not act in bad faith or with gross negligence or willful misconduct in performing its duties under the Disbursement Agreement." Id. at *34.  Third, the District Court found that there was no evidence on summary judgment that Bank of America breached the Disbursement Agreement by disbursing funds despite having actual knowledge that a condition precedent was not satisfied. Id. at * 35.

The Term Lenders timely filed a Notice of Appeal on March 22, 2012.

8

### III.  STANDARD OF REVIEW

"This Court reviews the granting of summary judgment de novo, applying the same legal standards which bound the district court."  Whatley v. CNA Ins. Companies, 189 F.3d 1310, 1313 (11th Cir. 1999).  "Summary judgment is appropriate only when there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Id. (quotation marks omitted).  "An issue of fact is material if it 'might affect the outcome of the suit under governing law'" and it is "genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Western Grp. Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1360 – 61 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 466 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).

All "evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment."  Blackston v. Shook and Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985).  The Court "must avoid weighing conflicting evidence or making credibility determinations."  Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).  "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."  Blackston, 764 F.2d at 1482 (internal citation omitted).

9

# IV.  DISCUSSION

In its appeal, the Term Lenders argue that the District Court erred in granting summary judgment to Bank of America because: 1) it based its determination on a misunderstanding of Bank of America's duties under the Disbursement Agreement; 2) there remain genuine issues of material fact about whether Bank of America breached the Disbursement Agreement; and 3) there remain genuine issues of material fact about whether Bank of America was grossly negligent.  We will discuss each of these issues in turn.

## A. BANK OF AMERICA'S DUTIES UNDER THE DISBURSEMENT AGREEMENT

In ruling on the summary judgment motion, the District Court necessarily had to determine what Bank of America's duties were under the relevant portions of the Disbursement Agreement.  Both parties agree that if the conditions precedent were satisfied, Bank of America was supposed to deliver an Advance Confirmation Notice so that the Term Lenders' funds could be disbursed to the Borrowers.  Both parties also agree that if any of the relevant conditions precedent were not satisfied Bank of America was required to issue a Stop Funding Notice. The parties disagree, however, on whether Bank of America had an affirmative duty to determine that the conditions precedent were satisfied or whether Bank of America was permitted to rely on the Borrowers' certifications that the conditions precedent were satisfied unless it had actual knowledge to the contrary.

10

The District Court determined that "[t]he Disbursement Agreement imposed on Bank of America no duty to inquire or investigate whether [the Borrower's] representations that all conditions precedent had been met were accurate." In re Fontainebleau, 2012 WL 930290, at *48. For the reasons set out here, we agree with this determination.

"Under New York Law, the initial interpretation of a contract is a matter of law for the court to decide." Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998) (quotation marks omitted). [4]  A court must enforce a contract provision that is "complete, clear and unambiguous on its face . . . according to the plain meaning of the terms." Greenfield v. Phillies Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002). When interpreting a contract, a court should look at the whole agreement and try to give meaning to all of the contract's provisions. See RLI Ins. Co. v. Smiedala, 947 N.Y.S.2d 850, 853 (App. Div. 2012). But, in the face of any inconsistency between a general provision and specific provisions, the specific provisions prevail. See Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956).

The specific provision of the Disbursement Agreement that most directly addresses this issue is § 9.3.2. That section explains that:

> Notwithstanding anything else in this Agreement to the contrary, in performing its duties hereunder, including approving any Advance

---

[4] The Disbursement Agreement says that it is to be governed by New York law. **[D.A. § 11.6]**

11

Requests . . . the Disbursement Agent shall be entitled to rely on certifications from the Project Entities . . . as to the satisfaction of any requirements and/or conditions imposed by this Agreement.

The clear language of this provision supports Bank of America's interpretation of its duties under the Disbursement Agreement: Bank of America had to determine that the conditions precedent were satisfied, but in doing so it was permitted to rely on the Borrower's certifications.

Bank of America, as Disbursement Agent, would not have been permitted to rely on the Borrowers' certifications that the conditions precedent were met if it had actual knowledge to the contrary. If Bank of America actually knew that a condition precedent was not satisfied, it would not be commercially reasonable to interpret the Agreement to allow Bank of America to disregard that knowledge by pointing to a certification by the Borrower, which it knows to be false. See In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (App. Div. 2003) (explaining that a contract "should not be interpreted to produce a result . . . commercially unreasonable, or contrary to the reasonable expectations of the parties" (internal citations omitted)).

However, if Bank of America merely had information that was inconsistent with the Borrowers' certification, it did not have an affirmative duty to determine whether the condition precedent was actually satisfied. Section 9.3.2 does not include any language requiring Bank of America, as Disbursement Agent, to verify

12

the accuracy of the Borrowers' certifications.  Instead, immediately following the language quoted above, § 9.3.2 includes language suggesting that the opposite is true:

> The Disbursement Agent shall not be required to conduct any independent investigation as to the accuracy, veracity or completeness of any such items . . . .

In addition, according to § 9.10 of the Agreement, "nothing in this Agreement . . . shall be so construed as to impose" obligations on Bank of America "except as expressly set forth herein."

Under this interpretation of Bank of America's duties as Disbursement Agent, Bank of America would still have to determine whether each condition precedent was satisfied if it did not have a certification it could rely on.  For example, as the Term Lenders point out, there are some conditions for disbursement that the Borrowers could not certify, such as the condition in § 3.3.24, requiring that the Bank Agent "receive[] such other documents and evidence as are customary . . . as the Bank Agent may reasonably request."  Also, it is not hard to imagine a circumstance in which the Borrowers chose not to give such a certification or where Bank of America had actual knowledge that the certification was false.  In situations like these, § 9.3.2 would play no role because there would be no certification Bank of America, as Disbursement Agent, could rely on when determining whether the condition precedent was satisfied.  It is

13

under these circumstances that other provisions of the Agreement – such a § 9.2.1, giving Bank of America the right to review information supporting the Advance Requests, and § 2.5.1, requiring that Bank of America "specify, in reasonable detail, the conditions precedent which [it] has determined have not been satisfied" – would have had more relevance

## B. DID BANK OF AMERICA BREACH THE DISBURSEMENT AGREEMENT?

Bank of America was permitted to rely on the Borrowers' certifications unless it had actual knowledge that the conditions precedent were not satisfied. During the relevant period, the Borrowers certified that the conditions precedent were met.  Therefore, Bank of America could have only been in breach by disbursing funds to the Borrowers if it had actual knowledge that the conditions precedent were not satisfied.

In granting summary judgment to Bank of America, the District Court determined that "with all inferences in favor of the Term Lenders, the Term Lenders . . . failed to present a genuine issue of material fact as to whether Bank of America, as Disbursement Agent or Bank Agent, had actual knowledge of the failure of any conditions precedent to disbursement."  In re Fontainebleau, 2012 WL 930290, at *48.  For the reasons we will outline here, we have come to a different conclusion.

14

As detailed in the District Court's thorough opinion, the Term Lenders contend that Bank of America should have stopped disbursing funds to the Borrowers because, at some point between September 2008 and March 2009, Bank of America became aware of certain events, discussed below, that it knew caused the failure of seven separate conditions precedent listed in § 3.3 of the Disbursement Agreement. Id. at *8–9, 15–24. Under the terms of that agreement, once the Bank of America knew that conditions precedent were not satisfied, it was required to issue a Stop Funding Notice to temporarily halt disbursal of the funds.

### 1. Lehman Brothers' Bankruptcy and Failure to Fund

Lehman Brothers Holdings, Inc. (Lehman) was the largest lender under the Retail Facility and the Administrative Agent of the Retail Facility. No one disputes that Lehman filed for bankruptcy on September 15, 2008. Neither is it disputed that Fontainebleau funded Lehman's approximately $2.5 million share of the September 2008 Retail Advance and essentially funded Lehman's portion of the Retail Advances from December 2008 through March 2009 by reimbursing ULLICO, a Co-Lender under the Retail Facility, for funding those amounts.

The failure of Lehman may have caused the failure of several conditions precedent in and of itself. For example, Fontainebleau's funding of Lehman's share of the September Retail Advance was a failure of the condition in § 3.3.23, requiring that the Retail Lenders make all advances required of them. Also, if

15

Lehman's bankruptcy was a "change in the economics" of the Project "which could reasonably be expected to have a Material Adverse Effect," there would have been a failure of the condition in § 3.3.11, requiring that no such change shall have occurred. [5]

What the parties do dispute is whether Bank of America had actual knowledge of these events and whether the impact of these events on the conditions precedent was such that the disbursing of funds constituted a breach of contract. The Term Lenders argue that Bank of America had actual knowledge that Lehman did not fund its share of the September Retail Advance and that Fontainebleau paid the money for Lehman. In support of this view of the facts, the Term Lenders point to a number of things: 1) a series of letters from Highland Capital Management, one of the original term lenders, alerting Bank of America to the serious impact Lehman's bankruptcy could have on the Project and suggesting that Fontainebleau funded Lehman's share of the September Retail Advance; 2) testimony by McLendon Rafeedie, the primary contact at TriMont Real Estate

---

[5] The Term Lenders also argue that Lehman's bankruptcy and its failure to fund could have led to the failure of several other conditions precedent in the Disbursement Agreement: § 3.3.21, requiring that the Bank Agent shall not have become aware of information that is materially inconsistent with the information disclosed to them; § 3.3.3, requiring that no "Default or Event of Default" has occurred and is continuing ; and § 3.3.2, requiring that the Borrowers' representation that there was no "Event of Default" was true in all material respects. Our analysis of Bank of America's actual knowledge applies equally to these conditions precedent even though we do not specifically discuss them. The Term Lenders made other arguments on appeal about why genuine issues of material fact remain with respect to Bank of America's knowledge of the failure of these conditions. However, our analysis in this section makes it unnecessary for us to address them.

Advisors, Inc. about TriMont's role as servicer of the Retail Facility, explaining that he knew Fontainebleau funded for Lehman and suggesting that it was possible that he informed Bank of America about this; 3) an October 2008 meeting among executives of Fontainebleau, Bank of America, and certain Retail Co-Lenders where the implications of Lehman's bankruptcy were discussed; and 4) Fontainebleau's suspicious evasiveness on the topic of Lehman's bankruptcy and its nonresponsive answers to Bank of America's questions about who funded Lehman's share of the September Advance.

As the District Court's opinion details, there are ways to discount each of these categories of evidence as showing, at most, a reason that Bank of America should have been suspicious that Fontainebleau funded Lehman's share of the September Retail Advance.  See In re Fontainebleau, 2012 WL 930290, at *37–40. However, taken together and viewed in the light most favorable to the Term Lenders, we conclude that this circumstantial evidence creates a genuine issue of material fact with respect to whether Bank of America had actual knowledge that Fontainebleau paid Lehman's share of the September Retail Advance.  Cf. United States v. Santos, 553 U.S. 507, 521, 128 S. Ct. 2020, 2029 (2008) (explaining that the "knowledge element" of the offense "will be provable (as knowledge must almost always be proved) by circumstantial evidence").

Forwarding a similar argument, the Term Lenders also say that Bank of America had actual knowledge that Lehman's bankruptcy was a "change in the economics . . . which could reasonably be expected to have a Material Adverse Effect." To support this proposition, the Term Lenders highlight: 1) the large share of the Retail Facility that Lehman was responsible for funding; 2) contemporaneous statements made by Bank of America employees about the potential impact Lehman's bankruptcy would have on the Project together with their later explanations of those statements; 3) the letters from Highland Capital Management mentioned above; and 4) discussions at the October 2009 meeting (also mentioned above) about the impact of Lehman's bankruptcy on the Project and the Retail Co-Lenders' unwillingness to pay Lehman's portion if Lehman was unable to pay.

The District Court's opinion accurately details how, despite Lehman's bankruptcy, "there was no indication that there would be a shortfall in Retail Funds or that the Retail Lenders would fail to honor their obligations under the Retail Facility." In re Fontainebleau, 2012 WL 930290, at * 17. However, when taken together and viewed in the light most favorable to the Term Lenders, we conclude that the Term Lenders' evidence raises a genuine question of material fact about whether Bank of America had actual knowledge that Lehman's bankruptcy was a

change in the economics of the Project "which could <u>reasonably be expected</u> to have a Material Adverse Effect." (emphasis added).

## 2. First National Bank of Nevada's Repudiation, Cost Overruns, and the Default of Several Delay Draw Term Lenders

That several other events of consequence happened during the period of September 2008 through 2009 is also undisputed. First, in late December 2008, the Federal Deposit Insurance Corporation, which had been appointed as receiver of First National Bank of Nevada (a Delay Draw Term Loan and Revolving Loan Lender), formally repudiated First National Bank of Nevada's unfunded Senior Credit Facility commitments. These commitments amounted to $1,666,666 under the Delay Draw Term Loan and $10,000,000 under the Revolver Loan.

Second, in January and March 2009, the Construction Consultant issued Project Status Reports expressing concerns that the Borrowers' Anticipated Cost Report did not accurately reflect increases in the Project budget. In March, the Consultant issued a Construction Consultant Advance Certificate declaring that there were material errors in the Advance Request and that the budget did not accurately reflect costs. By the end of March, the Borrowers increased the Project budget by more than $114,000,000.[6]

---

[6] The Borrowers first increased construction costs by $64,854,000. Based on the Construction Consultant's Advance Certificate, the Borrowers increased the budget by another $50,000,000.

19

Third, in March 2009, the Borrowers submitted a Notice of Borrowing requesting a Delay Draw Term Loan for the entire $350 million facility. Guggenheim (which controlled five Delay Draw Term Loan investment funds) and Z Capital Finance, LLC (a Delay Draw Term Lender) failed to give Bank of America funds as they were obligated to under the Credit Agreement. Guggenheim's portion of the Delay Draw Term Loan was $10,000,000 and Z Capital was responsible for $11,666,666. Despite their failure to fund, Bank of America included these commitments as "Available Funds" to calculate whether the Project was "In Balance."

No one disputes that these events may be relevant to several conditions precedent. For example, if either First National Bank of Nevada's repudiation or Guggenheim's and Z Capital's failures to fund "could reasonably be expected to result in a Material Adverse Effect," this would have been an Event of Default under the Credit Agreement. Based on this, the condition in § 3.3.3 of the Disbursement Agreement would not have been satisfied.[7] Also, if these events,

---

[7] This condition required that "No Default or Event of Default shall have occurred and be continuing." "Event of Default" was defined as being an "Event of Default under any of the Facility Agreements." One "Event of Default" under the Credit Agreement was any breach or default by any party to the agreements of any term of the agreements provided that it "could reasonably be expected to result in a Material Adverse Effect."

If Bank of America had actual knowledge that the condition in § 3.3.3 was not satisfied because there was an "Event of Default," the condition in § 3.3.2 would also be implicated because Bank of America would have had actual knowledge that Fontainebleau's representation that there was no "Event of Default" was not "true and correct."

20

considered together with Lehman's bankruptcy, amounted to a "change in the economics" of the Project "which could reasonably be expected to have a Material Adverse Effect," then the condition in § 3.3.23 would not have been satisfied.

However, the parties do dispute whether these events did, in fact, cause failures of the conditions precedent and whether Bank of America had actual knowledge of the failures. The primary basis for the District Court's determination that these events did not constitute failures of conditions precedent, which Bank of America urges us to adopt, was its determination that each of these events was not material, as a matter of law. See In re Fontainebleau, 2012 WL 930290, at *43–44. In arguing to defeat this materiality determination by the District Court, and to support their own view that these events "could reasonably be expected to have a Material Adverse Effect," the Term Lenders: 1) take issue with the District Court's finding that the loan amounts of the Senior Credit Facility that were not available due to First National Bank of Nevada's repudiation and Guggenheim's and Z Capital's failures to fund were immaterial as a matter of law; 2) point out that, as the District Court acknowledged, Guggenheim's and Z Capital's failures to fund caused the Project's budget to be out of balance; 3) highlight Bank of America's recognition of how difficult it would be to secure alternative lenders; and 4) argue that "[t]he intricate, interlocking agreements reflected the reality that no reasonable

21

lender would fund without assurances that <u>other</u> lenders would also fund to completion."

Considering all of this together, the Term Lenders have raised genuine issues of material fact about whether there were "Events of Default" to the extent that these events "could reasonably be expected to have a Material Adverse Effect" and whether Bank of America had actual knowledge of this fact.  <u>Cf. e.g.</u>, <u>Lucas v. Fla. Power & Light Co.</u>, 765 F.2d 1039, 1040–41 (11th Cir. 1985) (explaining that "questions of materiality" are "[m]ixed questions of law and fact" that "involve assessments peculiarly within the province of the trier of fact"); <u>Willjeff, LLC v. United Realty Mgmt. Corp.</u>, 920 N.Y.S.2d 495, 497 (N.Y. App. Div. 2011) (explaining that materiality is generally a question for the finder of fact unless "the evidence concerning the materiality is clear and substantially uncontradicted"). Even if First National Bank of Nevada's repudiation, and Guggenheim's and Z Capital's failures to fund could not have been expected to result in a Material Adverse Effect when considered one by one, taken together and in conjunction with the large increase in the Project budget and Lehman's bankruptcy, we have no problem concluding there is a genuine issue of material fact regarding whether Bank of America knew that there was a "change in the economics" of the Project

22

"which could reasonably be expected to have a Material Adverse Effect," thereby implicating the condition in § 3.3.11. [8]

## C.  WAS BANK OF AMERICA GROSSLY NEGLIGENT?

Under § 9.10 of the Disbursement Agreement, Bank of America, as Disbursement Agent, had no responsibility "except for any bad faith, fraud, gross negligence or willful misconduct" and could not be held liable for any loss "except as a result of [its] bad faith, fraud, gross negligence or willful misconduct."  Under New York law, these are high standards.  For example, New York law defines gross negligence as "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing," Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd., 81 N.Y.2d 821, 823–24 (N.Y. 1993) (quotation marks omitted), or "the failure to exercise even slight care," Food Pageant, Inc. v. Consolidated Edison Co., Inc., 54 N.Y.2d 167, 172 (N.Y. 1981).

However, "[g]enerally, the particular standard of care which a defendant is judged against in a given case is a factual matter for the jury."  Food Pageant, Inc., 54 N.Y.2d at 172.  Thus, "[w]here the inquiry is to the existence or nonexistence of gross negligence . . . the question . . . [is] a matter for jury determination."  Id. at

---

[8] The Term Lenders argue that Bank of America was in breach of the Disbursement Agreement because it disbursed funds even though it had actual knowledge that seven conditions precedent had failed.  Because we have concluded that there were genuine issues of material fact as to five of these conditions, we decline to address the remaining two conditions precedent.  Neither will we address Term Lenders' arguments about several other purported failures of the conditions precedent we have discussed.  We leave it to the District Court to reevaluate these issues, as necessary, in light of this opinion and further proceedings before that court.

23

173. "While gross negligence may be found as a matter of law in some limited instances," Trump Int'l Hotel & Tower v. Carrier Corp., 524 F. Supp. 2d 302, 315 (S.D.N.Y. 2007), it cannot be resolved as a matter of law in this case.

Here, there is an issue of fact about whether Bank of America was grossly negligent. For example, under our interpretation of the Disbursement Agreement, Bank of America would have been in breach of the Agreement if it disbursed the Term Lenders' funds to the Borrowers even though it had actual knowledge that any one of the conditions precedent had failed. We have discussed why we believe there are genuine issues of material fact about whether Bank of America had actual knowledge that a number of conditions precedent had failed. In addition to those things we discussed, the Term Lenders have also established a dispute of material fact on the subject of whether Bank of America had actual knowledge that some of these conditions precedent had failed months before it disbursed funds to the Borrowers or that Bank of America had actual knowledge that some of these conditions precedent had failed for several different reasons. A jury could find that the cumulative effect of Bank of America's disbursing funds despite having actual knowledge about the failure of many different conditions precedent amounted to gross negligence. A jury could also find that certain conditions precedent were so material to the Agreement that Bank of America's conduct, including disbursing

24

funds to the Borrowers, showed a reckless disregard for the Term Lenders' rights to the extent it knew that those conditions were not satisfied.

## V. SEALED DOCUMENTS

Many of the documents filed in this case, including the parties' motions for summary judgment and appeal briefs, were filed under seal.  An example of the documents filed under seal is the Disbursement Agreement, which is central to this case.  This same document was publicly filed in other proceedings, including a case we heard at oral argument on the same day as this one.

At the request of the court, the parties have filed a joint letter agreeing that the underlying Agreements and many of the other documents in the record should be unsealed.  The parties also listed certain documents they wish to continue to keep under seal.  Upon remand of this case to the District Court, the Clerk is directed to unseal all of the documents in the record, except those delineated in the parties' request to retain them as sealed.

## VI. CONCLUSION

Having concluded that under the Disbursement Agreement Bank of America was permitted to rely on the Borrowers' certifications that the conditions precedent were satisfied unless it had actual knowledge to the contrary, and finding that there remain genuine issues of material fact about whether Bank of America had such knowledge and whether its actions amounted to gross negligence, we affirm in part

25

and reverse in part the District Court's order.  Specifically, we affirm the District Court's denial of the Term Lenders' Motion for Partial Summary Judgment and the District Court's interpretation of Bank of America's obligations under the Disbursement Agreement.  We reverse the District Court's grant of summary judgment in favor of Bank of America.  We also remand the case to the District Court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED**