WILSON, Circuit Judge:
In this appeal, we decide whether there was sufficient evidence to support a jury verdict finding a securities broker liable for the unlawful conversion of property by collusion. The jury found that Deutsche Bank Alex.Brown (Alex.Brown) colluded with William Johnson to convert a partnership interest he owned so that it would defeat Amegy Bank N.A.’s (Amegy Bank) prior perfected lien. Alex.Brown then filed a motion for judgment as a matter of law, both as to liability and as to punitive damages, or, alternatively, for a new trial. The district court denied the motion, and this appeal followed. We affirm the order denying judgment as a matter of law. We also affirm the denial of the alternative motion for a new trial.
I.
On May 1, 2008, Amegy Bank loaned Monarch Flight II, LLC (Monarch), $15 million to buy a jet. Johnson was Monarch’s sole owner. Johnson, as guarantor for Monarch, gave Amegy Bank a security interest in his partnership interest in Host Hotels & Resorts LP (HLP) worth at least $9 million. The security agreement prohibited the sale, transfer, or other disposition of the collateral without Amegy Bank’s prior approval. The security agreement also gave Amegy Bank a security interest in any proceeds from the transfer of the HLP partnership interest, expressly including any equity interest Johnson might obtain in Host Hotels & Resorts, Inc. (HINC) as a result of the exchange or redemption of his HLP partnership interest. Pursuant to that security agreement, Amegy Bank could enforce its security interest upon default under the promissory note by taking possession and effecting sale of the collateral. Amegy Bank also filed a Uniform Commercial Code financing statement with the State of Georgia, giving Amegy Bank a perfected security interest in the collateral.
William Rhodes was managing director of the Atlanta office of AIex.Brown. Work-, ing in wealth advising, financial planning, and stock brokerage roles, Rhodes was experienced in financial matters. He and Johnson had worked together on prior business deals before, and had known one another socially for at least ten years. Rhodes had attended a Christmas party Johnson hosted at Johnson’s home, had accompanied him on Johnson’s private jet on four separate occasions,[1] and had given Johnson general investment advice.
In May 2009, Rhodes helped Johnson refinance two properties with $11.5 million dollars in loans funded through Deutsche Bank Private Wealth Mortgage, Ltd. (Deutsche Bank PWM). As part of what *925 was essentially due diligence (on behalf of Deutsche Bank PWM) incident to the transaction, Rhodes analyzed Johnson’s liquidity and determined that the same HLP partnership interest subject to the Amegy Bank loan could be a source of repayment for the Deutsche Bank loans in the event of default. In the refinance application, Johnson included a personal financial statement that listed Johnson’s partnership interest in HLP as an asset. The statement represented that the interest was unencumbered, in spite of Amegy Bank’s security interest.
Rhodes directed the initiation of background research on Johnson for a “Know Your Customer” report which included Amegy Bank’s recorded UCC lien on the HLP partnership interest.[2] The Know Your Customer report totaled over 1,000 pages. Rhodes received and reviewed the Know Your Customer report. While the Know Your Customer report alone would not have alerted Rhodes to Amegy Bank’s security interest, the entry included an identification number that would have allowed Rhodes to look up the associated financing statement and determine that the subject collateral included the HLP partnership interest and any HINC stock Johnson obtained from the redemption of the HLP partnership interest. At the close of drafting the Know Your Customer report, Rhodes signed and sent a letter to Deutsche Bank PWM representing that the Know Your Customer report was “complete and accurate.” Deutsche Bank PWM subsequently loaned Johnson $11.5 million, from which AB received a $58,000 commission. Rhodes personally received' forty percent of that commission.
Then, in December of 2009, Johnson defaulted on the Amegy Bank loan. On December 10, 2009, Amegy Bank formally demanded a fifty percent pay down and threatened to accelerate the loan in three weeks if there was no payment.
John Bobo, Johnson’s attorney, responded with a letter dated December 31 confirming that Johnson still owned the HLP partnership interest, that its value was $9,666,101.44, and that it remained pledged to Amegy Bank. But a few days later, Johnson converted the partnership units into HINC stock and sold the stock before Amegy Bank was able to take action.
The sequence of events transpired quickly. On January 5, 2010, Johnson sent a notice of redemption of his HLP partnership interest to HLP. In the notice, Johnson requested that the redemption be “handled as expeditiously as possible,” and he represented that the partnership interest was unencumbered and that he had “the full right, power and authority to redeem and surrender [the HLP partnership interest].” HINC, general partner of HLP, purchased the partnership interest from Johnson, paying him with shares of HINC stock. Notice of the redemption was withheld from Amegy Bank.
By then, Johnson was also in default on the $11.5 million dollar Deutsche Bank PWM loan that Rhodes set up. On January 12, Johnson attempted to stave off Amegy Bank by sending them an email claiming that their payment would be made in ten days. Twenty-four minutes after this correspondence, Johnson’s assistant contacted Rhodes who then proceeded to expeditiously open a securities account for Johnson. Rhodes emailed his assistant the following: “We openned [sic] an account for [Johnson] to do a loan last year. Please take that information and let me know what we need to do to set it up to trade stocks. Need FAST.” Johnson *926 opened a margin account with Alex.Brown on January 15. By opening the account, Johnson authorized the investigation of his credit standing and business conduct, as well as the sharing of any other information AlexJBrown had about Johnson among Alex.Brown and any of its affiliates. The account was opened with the purported objectives of “growth” and “capital appreciation.”
Johnson’s assistant sent an email on January 19 to ComputerShare, the transfer agent issuing the HINC stock, requesting that the stock certifícate be overnight-ed to Johnson’s office on the date of issue; Rhodes was blind copied on this email. On January 22, Johnson directed Alex. Brown, via Rhodes, to sell the HINC stock. Also on January 22, Johnson satisfied the delinquencies on the Deutsche Bank PWM loans using checks drawing on his JPMorgan Chase Bank account.[3] The HINC stoek sale was completed on January 26. On the same day, Johnson received the $9,516,052.12 from the sale of the stock; he deposited that amount into his JPMorgan Chase Bank account on January 27. In the course of carrying out the transaction, Rhodes drove and personally picked up the physical stock certifícate from Johnson’s office.
By the time of trial, the Amegy Bank loan’s outstanding balance was over $16 million dollars. Amegy Bank filed a complaint[4] against Alex.Brown and Deutsche Bank PWM alleging, inter alia> that AB wrongfully converted Amegy Bank’s collateral. Alex.Brown raised “UCC 8-115, as codified under the state law applicable to the transaction,”[5] asserting that, as a securities intermediary, Alex.Brown was entitled to immunity under that section. The parties moved for partial summary judgment on that issue. The district court, however, denied the motions, and the action proceeded to a jury trial. At trial, Rhodes testified and denied reviewing the financing statement reflecting Amegy Bank’s prior perfected security interest or even noticing the entry in the Know Your Customer report referencing it on page 14. And when Rhodes was asked at trial whether Johnson’s conduct would raise a “red flag” under federal securities regulations, he said no. Rhodes admitted, however, knowing that Johnson received the HINC stock in return for redemption of the HLP partnership interest.
The jury found that Alex.Brown acted through Rhodes as a securities intermediary for Johnson and colluded with him in converting Amegy Bank’s collateral, defeating Alex.Brown’s section 11-8-115 defense. Based on the district court’s instruction that O.C.G.A. § 44-12-152 set the applicable standard for an action for damages for conversion, the jury set compensatory damages at $16.7 million. The jury also found that Alex.Brown had acted with willful misconduct and assessed $201,000 in punitive damages. The district court entered a final judgment on the jury’s verdict. Alex.Brown moved for judgment as a matter of law or, alternatively, a new trial. See Fed.R.Civ.P. 50(b), 59. Alex.Brown argued that the evidence was insufficient to support the jury verdict as to liability and as to punitive damages. AlexJBrown alternatively argued that it was entitled to a new trial based on the *927 district court’s purportedly defective jury instructions and an allegedly inconsistent jury verdict. The district court denied the motion, and this appeal ensued.
II.
We first consider whether the trial judge erred by denying the motion for judgment as a matter of law. Alex.Brown argues that Amegy Bank presented no evidence of Alex.Brown’s actual knowledge of the wrongfiilness of Johnson’s conduct or of Rhodes’s substantial assistance to Johnson, each a prerequisite to defeat section 11-8-115. Alex.Brown also argues that the evidence is insufficient to support punitive damages. We then review Alex. Brown’s request for a new trial based on its assertion that the jury verdict was inconsistent and that the district court’s jury instructions were erroneous.
A.
We review the denial of a motion for judgment as a matter of law under Rule 50(b) de novo, construing the evidence in the light most favorable to the party opposing the motion. Gowski v. Peake, 682 F.3d 1299, 1310 (11th Cir.2012) (per curiam). ‘“Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.’ ” Id. at 1311 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000)). An appellate court is particularly ill-suited to the task of judging the credibility of a witness because, unlike the district court, we do not have the benefit of. observing the witness while • he testifies and assessing his demeanor. See Owens v. Wainwright, 698 F.2d 1111, 1113 (11th Cir.1983) (per curiam). Importantly, we “ ‘must disregard all evidence favorable to the moving party that the jury is not required to believe.’” Gowski, 682 F.3d at 1311 (quoting Reeves, 530 U.S. at 151, 120 S.Ct. at 2110).
Our deferential review of jury findings considers the entitlement of the jury to rely on circumstantial evidence to reach a conclusion in conflict with direct evidence. See Acoff v. Abston, 762 F.2d 1543, 1548 (11th Cir.1985), abrogated on other grounds by Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), as recognized in Quiles v. City of Tampa Police Dep’t, 596 Fed.Appx. 816, 820 (11th Cir.2015) (per curiam). “[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied,” and granting the motion is warranted only where “a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action.” Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir.2006) (internal quotation marks omitted).
1.
Alex.Brown argued in the district court, and argues here, that it was entitled to judgment on the conversion count pursuant to O.C.G.A. § 11-8-115, which insulates “[a] securities intermediary that has transferred a financial asset” from “liabfility] to a person having an adverse claim to the financial asset.” Id. If the statute stopped there, Alex.Brown, as a securities intermediary, would not be liable for the conversion of Amegy Bank’s collateral in any case. The provision, however, excepts from immunity those securities intermediaries that have “[ajcted in collusion with the wrongdoer in violating the rights of the adverse claimant.” Id. § 11-8-115(2). In other words, a securities intermediary that colludes with a wrongdoer in that *928 wrongdoer’s violation of an adverse claimant’s rights can be liable for conversion despite section 11-8-115 immunity. The resolution of this case depends, therefore, upon whether Alex.Brown, through Rhodes, colluded with Johnson to convert the collateral used to secure the Amegy Bank loan.
The burden for proving collusion under section 11-8-115(2) is a heavy one.[6] The commentary to section 11-8-115 provides some detail:
Knowledge that the action of the customer [Johnson] is wrongful is a necessary but not sufficient condition of the collusion test_ It is not the role of the record-keeper to police whether the transactions recorded are appropriate, so mere awareness that the customer may be acting wrongfully does not itself constitute collusion. That, of course, does not insulate an intermediary or broker from responsibility in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong.
O.C.G.A. § 11-8-115 cmt. n. 5. In other words, that Rhodes may have been aware of suspicious activity on Johnson’s part, had constructive knowledge of Johnson’s wrongdoing, or failed to investigate Johnson’s right to transfer the HINC stock would not be sufficient to subject AB to liability for collusion.
The commentary to the statute advises that collusion is tantamount to tortious aiding and abetting as defined in the Restatement (Second) of Torts. See id. A defendant is liable for aiding and abetting a tortious act if the defendant
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other’s conduct constitutes a breach of duty and gives substantial assistance qr encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
Restatement (Second) of Torts § 876. Thus, the district court instructed the jury to hold AlexJBrown liable if it:
1. Committed conversion in concert with Johnson or pursuant to a common design with him; or
2. Knew that Johnson’s conduct constituted conversion and gave him substantial assistance or encouragement to commit conversion; or
3. Gave substantial assistance to Johnson in committing the conversion, and its own conduct, separately considered, constituted a conversion as well.
Of these, the second is most applicable here; Alex.Brown can properly be held liable for conversion if there is sufficient evidence that it (1) knew that Johnson’s conduct constituted conversion, and (2) gave Johnson substantial assistance or encouragement to commit the conversion. See id. § 876(h).
a.
The parties first dispute whether there was sufficient evidence to support the first element of that definition — actual knowl *929 edge. Amegy Bank presented no direct evidence of Rhodes’s actual knowledge of Amegy Bank’s prior perfected security interest and, hence, no direct evidence of Rhodes’s actual knowledge “that the action of [Johnson was] wrongful.” See O.C.G.A. § 11-8-115 cmt. n. 5. Alex.Brown argues that Amegy Bank’s reliance on a constructive knowledge or failure to investigate theory of liability, is not sufficient to overcome Alex.Brown’s securities intermediary immunity. See id. § 11-8-115. Amegy Bank, however, did not rely upon such a theory at trial. Amegy Bank argued that its evidence was sufficient for the jury to infer that Rhodes actually knew that Johnson’s conduct — redeeming the partnership interest and liquidating the stock — constituted conversion. Moreover, the jury instruction required a finding of actual knowledge, not constructive knowledge or willful ignorance, to defeat section 11 — 8— 115 immunity. See Johnson v. Breeden, 280 F.3d 1308, 1319 (11th Cir.2002) (“[W]e must presume that juries follow their instructions.”). The question, then, is whether a jury reasonably could infer from the record that Alex.Brown had actual knowledge that the partnership interest and the HINC stock were subject to a prior security agreement, and that their alienation violated the terms of that agreement. We think that it could.
A number of factors, especially when considered together, support an inference that Alex.Brown, through Rhodes, had actual knowledge of Amegy Bank’s prior perfected security interest and the wrongfulness of Johnson’s conduct. First, Rhodes and Johnson had a pre-existing, ten-year-long, professional and, at least incidentally, social relationship. When Johnson helped Rhodes refinance properties with $11.5 million dollars in loans funded through Deutsche Bank PWM, he did his due diligence. He analyzed Johnson’s liquidity and the availability of the HLP partnership interest as a source of repayment for the Deutsche Bank PWM loan in the event of a default. A reasonable jury could infer that the professional and social aspect of the relationship led the two to discuss such matters even where those matters did not bear directly on their professional conduct. Rhodes was primarily responsible for extending the Deutsche Bank PWM loans to Johnson and, as a result, obtained access to much of Johnson’s financial information. This access included Rhodes’s participation in the Know Your Customer report process, a report that Rhodes reviewed and certified was “complete and accurate.” Though the Know Your Customer report totaled over 1,000 pages, the reference to Amegy Bank’s security interest appeared near the beginning, on page 14. Rhodes testified that he did not learn of the security interest during the Deutsche Bank PWM, loan investigation, but Rhodes’s previous representations that the Know Your Customer report was complete and accurate and the placement of the security interest reference near the beginning of the Johnson Know Your Customer report tend to belie this testimony. Rhodes even received a substantial commission for his assistance in originating the PWM loans (40% of the $58,000.00 commission), which would give him a hefty financial interest in keeping Johnson’s account current. Before opening a margin account for Johnson, Alex. Brown and Rhodes again investigated his financial situation.
Rhodes’s fast-paced unloading of the HINC stock further supports an inference of actual knowledge. The fact that Johnson called Rhodes twenty-four minutes after Bobo sent an email to Amegy Bank falsely representing that Johnson continued to hold the HLP partnership interest and was prepared to bring the Amegy Bank loan current indicates some likeli *930 hood that AIex.Brown, through Rhodes, was aware of the wrongfulness of Johnson’s actions. Rhodes testified at trial that he failed to recall the content of the telephone conversation, but his haste in setting up the margin account immediately after the call impeaches his credibility. Johnson’s request to have the HINC stock certificate overnighted to his office further indicates Alex.Brown’s participation in and knowledge of wrongful conduct through Rhodes. Rhodes’s suspicious conduct includes: selling the HINC stock on the day it was delivered without reviewing the certificate for restrictions (though there were none); personally driving to Johnson’s office to complete the transaction; and the next-day wiring of the proceeds from the sale of. the HINC stock into Johnson’s JPMorgan Chase Bank account. The jury was entitled to infer from this sequence of events that Rhodes not only had a motive to apprise himself of the details of Johnson’s finances, including the Amegy Bank security interest and its prohibition on transfer of the HLP partnership interest, but actually did so.
We have held that circumstantial evidence similar to what we have here can support an inference of actual knowledge. In Avenue CLO Fund, Ltd. v. Bank of America, N.A., a panel of this court reversed a district court’s grant of summary judgment based on its determination that “circumstantial evidence create[d] a genuine issue of material fact with respect to whether [the defendant] had actual knowledge” of particular facts, when such knowledge would have put the defendant in breach of its contract with the plaintiff. See 723 F.3d 1287, 1297 (11th Cir.2013). There, the plaintiff had to prove that the defendant had actual knowledge of facts constituting a failure to satisfy conditions precedent to a disbursement agreement, including the condition that a specific third-party lender fund the project. See id. at 1296. In concluding that there was a genuine issue of material fact regarding actual knowledge, we cited (1) correspondence alerting the defendant to the lender’s impending bankruptcy and “suggesting” that a third-party borrower had made payments in place of the lender, (2) testimony by an individual not employed by the defendant “suggesting that it was possible that he informed” the defendant about the improper payments, (3) a meeting where the defendant’s executives discussed the implications of the impending bankruptcy of the lender whose advances were required to fund the project under the disbursement agreement, and (4) the borrower’s “suspicious evasiveness on the topic of [the lender’s] bankruptcy and its nonre-sponsive answers to [the defendant’s] questions about who funded [the lender’s] share of the” advance in question. See id. at 1297.
Thus, in Avenue CLO Fund, the plaintiff presented no direct evidence of the defendant’s actual knowledge; at best, the plaintiff presented direct evidence of constructive knowledge, willful blindness, or failure to investigate. See id. While none of those three levels of culpability would have been sufficient to find in favor of the plaintiff, we held that a reasonable jury could reach the conclusion that the defendant had actual knowledge of the relevant facts because the evidence, though not direct, could support such an inference. See id. at 1296-97.
When considering a Rule 50(b) motion, it is the duty of the district court, and this court on de novo review, to construe the evidence in the light most favorable to the non-moving party. See Gowski, 682 F.3d at 1310-11. We have held that a jury is entitled to totally disregard direct evidence and credit contradictory evidence that was exclusively circumstantial.. See Acoff, 762 F.2d at 1548 (permitting jury to reach a *931 conclusion in conflict with direct evidence based solely on circumstantial evidence).
It should not be a surprise that the jury was forced to rely on purely circumstantial evidence to conclude that Alex.Brown had actual knowledge of Johnson’s wrongful conduct. It is difficult to imagine what sort of evidence, other than an admission by Rhodes, would constitute direct evidence of Alex.Brown’s knowledge of Johnson’s wrongful conduct. See United States v. Santos, 553 U.S. 507, 521, 128 S.Ct. 2020, 2029, 170 L.Ed.2d 912 (2008) (“[Knowledge] will be provable (as knowledge must almost always be proved) by circumstantial evidence.”); cf. Wright v. Southland Corp., 187 F.3d 1287, 1295 n. 9 (11th Cir.1999) (noting that testimony by a third party that a decisionmaker- stated that he fired an individual because of her sex “would be direct evidence of the fact that the decisionmaker made the alleged statement ... [but] merely circumstantial evidence of the” decisionmaker’s state of mind); see also Colonial Stores, Inc. v. FTC, 450 F.2d 733, 744-45 (5th Cir.1971) (noting the necessity of proving actual knowledge through circumstantial evidence “since the only direct evidence of a state of mind must come from the testimony of the individuals who have broken the law”).[7]
Ultimately, Rhodes, Alex.Brown’s wealth advisor, took the stand and testified that he did not have actual knowledge of Amegy Bank’s security interest, but the jury obviously did not believe him and was entitled to infer the complete opposite. Rhodes had the Know Your Customer report in his hands before completing the Deutsche Bank PWM loan; Rhodes helped Johnson dispose of the HINC stock with deliberate speed — the emails admitted into evidence paired with the timeline show that Rhodes rushed the HINC stock sale through before Amegy Bank was able to find out about it. Rhodes wrote a letter to his boss confirming that he had reviewed the entire Know Your Customer report, which referenced the Host stock, and he told his boss that it was “accurate”; Rhodes had a financial interest in the transaction, making 40% of $58,000 on the deal; to sell the HINC stock, Johnson had the stock certificate overnighted to Johnson’s address; Rhodes then drove and picked it up himself; Rhodes was intimately aware of Johnson’s financial situation, and Rhodes and Johnson were business partners and friends for over ten years. The jury is better able than we are to assess Rhodes’ credibility, and it did not buy Rhodes’ testimony that he had no knowledge of the prior Amegy Bank lien. “When the resolution of the case boils down to credibility, the trial judge must allow the jury to function.” Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1558 (11th Cir.1984). The district court did just that here; it allowed the jury to function in permitting the jury’s inferences to stand, understanding that the “trial judge’s discretion to set aside a jury verdict based on the great weight of the evidence is very narrow.” See id. at 1559. Furthermore, our ability as an appellate court to set aside a jury verdict is more constrained; as we said in Owens, “[a]ppellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony.” 698 F.2d at 1113. We find, therefore, that the jury had a legally sufficient basis for concluding that AB had actual knowledge of Johnson’s wrongful conduct, and that the denial of the motion *932 for judgment as a matter of law was not reversible error.
b.
AlexJBrown also maintains that Amegy Bank did not present sufficient evidence to support the second element required to defeat section 11-8-115 immunity under a collusion theory — that Alex.Brown gave Johnson substantial assistance or encouragement to commit the conversion. Alex, Brown substantially assisted Johnson by carrying out the sale of the HINC stock and wiring the proceeds to Johnson’s JPMorgan Chase Bank account. Even if a securities intermediary’s role is typically too ministerial to “reach[ ] a level of affirmative misconduct” amounting to collusion, see O.C.G.A. § 11-8-115 cmt. n. 5, the evidence here supports the inference that Alex.Brown engaged in such affirmative misconduct by knowingly and actively taking part in the scheme to convert Amegy Bank’s collateral, rather than acting as a mere conduit. Rhodes’s interest in maintaining his professional relationships with both Deutsche Bank PWM and Johnson, as well as the quick turnaround of the transaction — setting up the margin account, personally picking up the certificate from Johnson’s office, selling the HINC stock without reviewing the certificate, and wiring the proceeds to Johnson’s JPMor-gan Chase Bank account the next day— support the jury’s inference that Alex. Brown affirmatively assisted Johnson in the conversion with the purpose of preserving Rhodes’s relationships with Deutsche Bank PWM and Johnson. Therefore, Amegy Bank presented sufficient evidence of Alex.Brown’s actual knowledge of Johnson’s misconduct and Alex.Brown’s substantial assistance in that misconduct to support the jury’s verdict.
2.
We turn to the trial judge’s denial of the request for punitive'damages. We review that denial de novo. Gowski, 682 F.3d at 1311; see also Boyd v. Homes of Legend, Inc., 188 F.3d 1294, 1298 n. 9 (11th Cir.1999) (“Whether punitive damages are recoverable presents a pure question of law; thus, we review de novo the district court’s resolution of the issue.”). Alex.Brown argues that punitive damages are only appropriate in Georgia where the defendant acts with the specific intent of harming the plaintiff. That is an incorrect statement of Georgia law.
In Georgia, “[pjunitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant’s actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.” O.C.G.A. § 51-12-5.1(b). The last of these — “want of care which would raise the presumption of conscious indifference to consequences” — falls short of specific intent. Moreover, under applicable Georgia law, an action for conversion generally supports punitive damages. See Taylor v. Powertel, Inc., 250 Ga.App. 356, 551 S.E.2d 765, 768 (2001) (“Action[s] for trover or for conversion are intentional torts and as such come within [section] 51-12-5.1(b).”). Therefore, we affirm the denial of the motion as to punitive damages.
B.
Finally, we reach Alex.Brown’s Rule 59 alternative motion for a new trial. We review the denial of such a motion for abuse of discretion. St. Luke’s Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1200 n. 16 (11th Cir.2009). Underlying legal error constitutes an abuse of discretion. Woodard v. Fanboy, LLC, 298 F.3d 1261, 1268 n. 14 (11th Cir.2002).
*933 First, as to the purportedly inconsistent jury verdict, Alex.Brown did not object to it before the jury was discharged and has therefore waived that argument. See Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1225 (11th Cir.2012).
Second, the jury instructions as to the collusion definition did not constitute an abuse of discretion. Alex.Brown essentially complains that the instructions are not sufficiently thorough. However, the precedent to which it cites does not support reversal for lack of thoroughness; those opinions reversed the district court where the instructions misled the jury. See Broaddus v. Fla. Power Corp., 145 F.3d 1283, 1287-88 (11th Cir.1998) (reversing the district court where it “did not offer a clarifying instruction and instead informed the jury that it could give the evidence in question whatever weight it deemed appropriate” despite evidence “thát the jury was focusing on a non-issue and possibly did not understand the precise burden of proof’); Mosher v. Speedstar Div. of AMCA Int’l, Inc., 979 F.2d 823, 825-26 (11th Cir.1992) (reversing where the district court (1) erroneously instructed the jury that patent danger and product misuse defenses were absolute bars to liability, and (2) misled the jury by instructing on product misuse because it was a non-issue).
Third, the district court’s instruction regarding the valuation of damages was not in error. Alex.Brown cites to a number of Georgia state court opinions, as well as a secondary source, to support its contention that O.C.G.A. § 44-12-152,[8] which the district court relied on in formulating the damages instruction, applies only where the defendant in a conversion action retains the property at least until the commencement of the trial. However, Alex.Brown incorrectly construes that authority. A complete reading of those decisions demonstrates that they hold that section 44-12-152 does not apply where the plaintiff has regained possession of the property in question before trial. See Lamb v. Salvage Disposal Co. of Ga., 244 Ga.App. 193, 535 S.E.2d 258, 261 (2000) (“[I]n an action for conversion, the measure of damages as set forth in [section] 44-12-152 applies only when the property continues to be ‘unlawfully detained.’ When a party elects to sue for damages for conversion and the property has been returned before trial, ... the damages are limited to recovery for the diminution in value of the property only for the time period between the alleged conversion and the property’s return.” (emphasis added) (citations and internal quotation marks omitted)); Walker v. Crane, 243 Ga.App. 838, 534 S.E.2d 520, 523 (2000) (“By the return of the property, the [plaintiffs] were precluded from the recovery of damages other than loss of hire and diminution in value between conversion and return of the property.” (emphasis added)); Charles R. Adams III, Georgia Law of Torts § 2:7 (citing Campbell v. Bausch, to support the proposition that section 44-12-152 is limited to “the highest proved value while the property was in the defendant’s possession,” where Campbell states, “[W]e could not agree with appellant that [section] 44-12-152 applies once the property has been returned to its rightful owner.” 195 Ga. App. 791, 395 S.E.2d 267, 269 (1990) (emphasis added)). Thus, under Georgia law, in a suit for damages for conversion, section 44-12-152 gives us the damages calculus unless the plaintiff has regained the *934 property that is the object of the lawsuit.[9] Accordingly, the district court did not err in instructing the jury that section 44r-12152 provided the appropriate measure of damages.
Consequently, because Alex.Brown is unable to demonstrate underlying legal error, we find no abuse of discretion in denying Alex.Brown’s request for a new trial.
III.
Because Amegy Bank presented sufficient evidence for a jury to infer that Alex.Brown colluded with Johnson to convert Amegy Bank’s collateral, and because the proceedings below are otherwise free of reversible error, we affirm.
AFFIRMED.

. These trips included one to Tennessee, where Rhodes viewed one of Johnson’s horses; another to New York City, where they had lunch at a yacht club with two other individuals; and two trips to the Bahamas. Rhodes characterized the trips as professionally oriented or for networking, rather than as social excursions.

. The lien shows up in Amegy Bank's name but does, not specifically say in the report that it is in relation to the HLP partnership interest.

. The stock sale had not yet been consummated, so the payment was not made from proceeds from sale of the HINC stock.

. Amegy Barde amended its complaint three times. The complaint relevant to this appeal is the third amended complaint.

. The claim is governed by Georgia law, so that state law is O.C.G.A. § 11-8-115.

. There is good reason for implementing hurdles to liability for securities intermediaries such as Alex.Brown. They often must act quickly to carry out client demands; requiring them to investigate their clients’ suspicious activity would make that quick turnaround nigh impossible. See O.C.G.A. §11--8 — 115 cmt. n. 3.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

. "For personalty unlawfully detained, the plaintiff may recover a sum in the amount of the highest value which he is able to prove existed between the time of the conversion and the trial.” O.C.G.A. § 44-12-152.

. It seems that the reason for this limitation on the application of section 44-12-152 is to prevent a double recovery, not to allow a defendant to limit its exposure for its wrongful conduct. AB attempts to use section 44-12-452 for the latter purpose.