[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12568
_____

D.C. Docket No. 2:12-cv-00243-SPC-CM


AMEGY BANK NATIONAL ASSOCIATION,

Plaintiff - Appellee,

versus

DEUTSCHE BANK ALEX.BROWN,
a division of Deutsche Bank Securities, Inc.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 10, 2015)

Before WILSON, FAY, and RIPPLE,[*] Circuit Judges.

WILSON, Circuit Judge:

_____
[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

In this appeal, we decide whether there was sufficient evidence to support a jury verdict finding a securities broker liable for the unlawful conversion of property by collusion.  The jury found that Deutsche Bank Alex.Brown (Alex.Brown) colluded with William Johnson to convert a partnership interest he owned so that it would defeat Amegy Bank N.A.'s (Amegy Bank) prior perfected lien.  Alex.Brown then filed a motion for judgment as a matter of law, both as to liability and as to punitive damages, or, alternatively, for a new trial.  The district court denied the motion, and this appeal followed.  We affirm the order denying judgment as a matter of law.  We also affirm the denial of the alternative motion for a new trial.

## I.

On May 1, 2008, Amegy Bank loaned Monarch Flight II, LLC (Monarch), $15 million to buy a jet.  Johnson was Monarch's sole owner.  Johnson, as guarantor for Monarch, gave Amegy Bank a security interest in his partnership interest in Host Hotels & Resorts LP (HLP) worth at least $9 million.  The security agreement prohibited the sale, transfer, or other disposition of the collateral without Amegy Bank's prior approval.  The security agreement also gave Amegy Bank a security interest in any proceeds from the transfer of the HLP partnership interest, expressly including any equity interest Johnson might obtain in Host Hotels & Resorts, Inc. (HINC) as a result of the exchange or redemption of his

HLP partnership interest.  Pursuant to that security agreement, Amegy Bank could enforce its security interest upon default under the promissory note by taking possession and effecting sale of the collateral.  Amegy Bank also filed a Uniform Commercial Code financing statement with the State of Georgia, giving Amegy Bank a perfected security interest in the collateral.

William Rhodes was managing director of the Atlanta office of Alex.Brown. Working in wealth advising, financial planning, and stock brokerage roles, Rhodes was experienced in financial matters.  He and Johnson had worked together on prior business deals before, and had known one another socially for at least ten years.  Rhodes had attended a Christmas party Johnson hosted at Johnson's home, had accompanied him on Johnson's private jet on four separate occasions,[1] and had given Johnson general investment advice.

In May 2009, Rhodes helped Johnson refinance two properties with $11.5 million dollars in loans funded through Deutsche Bank Private Wealth Mortgage, Ltd. (Deutsche Bank PWM).  As part of what was essentially due diligence (on behalf of Deutsche Bank PWM) incident to the transaction, Rhodes analyzed Johnson's liquidity and determined that the same HLP partnership interest subject to the Amegy Bank loan could be a source of repayment for the Deutsche Bank

---

[1] These trips included one to Tennessee, where Rhodes viewed one of Johnson's horses; another to New York City, where they had lunch at a yacht club with two other individuals; and two trips to the Bahamas.  Rhodes characterized the trips as professionally oriented or for networking, rather than as social excursions.

loans in the event of default.  In the refinance application, Johnson included a personal financial statement that listed Johnson's partnership interest in HLP as an asset.  The statement represented that the interest was unencumbered, in spite of Amegy Bank's security interest.

Rhodes directed the initiation of background research on Johnson for a "Know Your Customer" report which included Amegy Bank's recorded UCC lien on the HLP partnership interest.[2]  The Know Your Customer report totaled over 1,000 pages.  Rhodes received and reviewed the Know Your Customer report. While the Know Your Customer report alone would not have alerted Rhodes to Amegy Bank's security interest, the entry included an identification number that would have allowed Rhodes to look up the associated financing statement and determine that the subject collateral included the HLP partnership interest and any HINC stock Johnson obtained from the redemption of the HLP partnership interest. At the close of drafting the Know Your Customer report, Rhodes signed and sent a letter to Deutsche Bank PWM representing that the Know Your Customer report was "complete and accurate."  Deutsche Bank PWM subsequently loaned Johnson $11.5 million, from which AB received a $58,000 commission.  Rhodes personally received forty percent of that commission.

---

[2] The lien shows up in Amegy Bank's name but does not specifically say in the report that it is in relation to the HLP partnership interest.

Then, in December of 2009, Johnson defaulted on the Amegy Bank loan. On December 10, 2009, Amegy Bank formally demanded a fifty percent pay down and threatened to accelerate the loan in three weeks if there was no payment.

John Bobo, Johnson's attorney, responded with a letter dated December 31 confirming that Johnson still owned the HLP partnership interest, that its value was $9,666,101.44, and that it remained pledged to Amegy Bank. But a few days later, Johnson converted the partnership units into HINC stock and sold the stock before Amegy Bank was able to take action.

The sequence of events transpired quickly. On January 5, 2010, Johnson sent a notice of redemption of his HLP partnership interest to HLP. In the notice, Johnson requested that the redemption be "handled as expeditiously as possible," and he represented that the partnership interest was unencumbered and that he had "the full right, power and authority to redeem and surrender [the HLP partnership interest]." HINC, general partner of HLP, purchased the partnership interest from Johnson, paying him with shares of HINC stock. Notice of the redemption was withheld from Amegy Bank.

By then, Johnson was also in default on the $11.5 million dollar Deutsche Bank PWM loan that Rhodes set up. On January 12, Johnson attempted to stave off Amegy Bank by sending them an email claiming that their payment would be made in ten days. Twenty-four minutes after this correspondence, Johnson's

5

assistant contacted Rhodes who then proceeded to expeditiously open a securities account for Johnson.  Rhodes emailed his assistant the following: "We openned [sic] an account for [Johnson] to do a loan last year.  Please take that information and let me know what we need to do to set it up to trade stocks.  Need FAST."  Johnson opened a margin account with Alex.Brown on January 15.  By opening the account, Johnson authorized the investigation of his credit standing and business conduct, as well as the sharing of any other information Alex.Brown had about Johnson among Alex.Brown and any of its affiliates.  The account was opened with the purported objectives of "growth" and "capital appreciation."

Johnson's assistant sent an email on January 19 to ComputerShare, the transfer agent issuing the HINC stock, requesting that the stock certificate be overnighted to Johnson's office on the date of issue; Rhodes was blind copied on this email.  On January 22, Johnson directed Alex.Brown, via Rhodes, to sell the HINC stock.  Also on January 22, Johnson satisfied the delinquencies on the Deutsche Bank PWM loans using checks drawing on his JPMorgan Chase Bank account.[3]  The HINC stock sale was completed on January 26.  On the same day, Johnson received the $9,516,052.12 from the sale of the stock; he deposited that amount into his JPMorgan Chase Bank account on January 27.  In the course of

---

[3] The stock sale had not yet been consummated, so the payment was not made from proceeds from sale of the HINC stock.

carrying out the transaction, Rhodes drove and personally picked up the physical stock certificate from Johnson's office.

By the time of trial, the Amegy Bank loan's outstanding balance was over $16 million dollars. Amegy Bank filed a complaint[4] against Alex.Brown and Deutsche Bank PWM alleging, *inter alia*, that AB wrongfully converted Amegy Bank's collateral. Alex.Brown raised "UCC 8-115, as codified under the state law applicable to the transaction,"[5] asserting that, as a securities intermediary, Alex.Brown was entitled to immunity under that section. The parties moved for partial summary judgment on that issue. The district court, however, denied the motions, and the action proceeded to a jury trial. At trial, Rhodes testified and denied reviewing the financing statement reflecting Amegy Bank's prior perfected security interest or even noticing the entry in the Know Your Customer report referencing it on page 14. And when Rhodes was asked at trial whether Johnson's conduct would raise a "red flag" under federal securities regulations, he said no. Rhodes admitted, however, knowing that Johnson received the HINC stock in return for redemption of the HLP partnership interest.

The jury found that Alex.Brown acted through Rhodes as a securities intermediary for Johnson and colluded with him in converting Amegy Bank's

---

[4] Amegy Bank amended its complaint three times. The complaint relevant to this appeal is the third amended complaint.
[5] The claim is governed by Georgia law, so that state law is O.C.G.A. § 11-8-115.

7

collateral, defeating Alex.Brown's section 11-8-115 defense.  Based on the district court's instruction that O.C.G.A. § 44-12-152 set the applicable standard for an action for damages for conversion, the jury set compensatory damages at $16.7 million.  The jury also found that Alex.Brown had acted with willful misconduct and assessed $201,000 in punitive damages.  The district court entered a final judgment on the jury's verdict.  Alex.Brown moved for judgment as a matter of law or, alternatively, a new trial.  *See* Fed. R. Civ. P. 50(b), 59.  Alex.Brown argued that the evidence was insufficient to support the jury verdict as to liability and as to punitive damages.  Alex.Brown alternatively argued that it was entitled to a new trial based on the district court's purportedly defective jury instructions and an allegedly inconsistent jury verdict.  The district court denied the motion, and this appeal ensued.

## II.

We first consider whether the trial judge erred by denying the motion for judgment as a matter of law.  Alex.Brown argues that Amegy Bank presented no evidence of Alex.Brown's actual knowledge of the wrongfulness of Johnson's conduct or of Rhodes's substantial assistance to Johnson, each a prerequisite to defeat section 11-8-115.  Alex.Brown also argues that the evidence is insufficient to support punitive damages.  We then review Alex.Brown's request for a new trial

8

based on its assertion that the jury verdict was inconsistent and that the district court's jury instructions were erroneous.

## A.

We review the denial of a motion for judgment as a matter of law under Rule 50(b) de novo, construing the evidence in the light most favorable to the party opposing the motion. *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012) (per curiam). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 1311 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000)). An appellate court is particularly ill-suited to the task of judging the credibility of a witness because, unlike the district court, we do not have the benefit of observing the witness while he testifies and assessing his demeanor. *See Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) (per curiam). Importantly, we "'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Gowski*, 682 F.3d at 1311 (quoting *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110).

Our deferential review of jury findings considers the entitlement of the jury to rely on circumstantial evidence to reach a conclusion in conflict with direct evidence. *See Acoff v. Abston*, 762 F.2d 1543, 1548 (11th Cir. 1985), *abrogated on other grounds by Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769 (2007), *as*

*recognized in Quiles v. City of Tampa Police Dep't*, 596 F. App'x 816, 820 (11th Cir. 2015) (per curiam).  "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied," and granting the motion is warranted only where "a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (internal quotation marks omitted).

1.

Alex.Brown argued in the district court, and argues here, that it was entitled to judgment on the conversion count pursuant to O.C.G.A. § 11-8-115, which insulates "[a] securities intermediary that has transferred a financial asset" from "liab[ility] to a person having an adverse claim to the financial asset." *Id.*  If the statute stopped there, Alex.Brown, as a securities intermediary, would not be liable for the conversion of Amegy Bank's collateral in any case.  The provision, however, excepts from immunity those securities intermediaries that have "[a]cted in collusion with the wrongdoer in violating the rights of the adverse claimant." *Id.* § 11-8-115(2).  In other words, a securities intermediary that colludes with a wrongdoer in that wrongdoer's violation of an adverse claimant's rights can be liable for conversion despite section 11-8-115 immunity.  The resolution of this

10

case depends, therefore, upon whether Alex.Brown, through Rhodes, colluded with Johnson to convert the collateral used to secure the Amegy Bank loan.

The burden for proving collusion under section 11-8-115(2) is a heavy one.[6] The commentary to section 11-8-115 provides some detail:

> Knowledge that the action of the customer [Johnson] is wrongful is a necessary but not sufficient condition of the collusion test. . . . It is not the role of the record-keeper to police whether the transactions recorded are appropriate, so mere awareness that the customer may be acting wrongfully does not itself constitute collusion. That, of course, does not insulate an intermediary or broker from responsibility in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong.

O.C.G.A. § 11-8-115 cmt. n.5. In other words, that Rhodes may have been aware of suspicious activity on Johnson's part, had constructive knowledge of Johnson's wrongdoing, or failed to investigate Johnson's right to transfer the HINC stock would not be sufficient to subject AB to liability for collusion.

The commentary to the statute advises that collusion is tantamount to tortious aiding and abetting as defined in the Restatement (Second) of Torts. *See id.* A defendant is liable for aiding and abetting a tortious act if the defendant

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or

---

[6] There is good reason for implementing hurdles to liability for securities intermediaries such as Alex.Brown. They often must act quickly to carry out client demands; requiring them to investigate their clients' suspicious activity would make that quick turnaround nigh impossible. *See* O.C.G.A. § 11-8-115 cmt. n.3.

11

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876. Thus, the district court instructed the jury to hold Alex.Brown liable if it:

1. Committed conversion in concert with Johnson or pursuant to a common design with him; or

2. Knew that Johnson's conduct constituted conversion and gave him substantial assistance or encouragement to commit conversion; or

3. Gave substantial assistance to Johnson in committing the conversion, and its own conduct, separately considered, constituted a conversion as well.

Of these, the second is most applicable here; Alex.Brown can properly be held liable for conversion if there is sufficient evidence that it (1) knew that Johnson's conduct constituted conversion, and (2) gave Johnson substantial assistance or encouragement to commit the conversion. *See id.* § 876(b).

a.

The parties first dispute whether there was sufficient evidence to support the first element of that definition—actual knowledge. Amegy Bank presented no direct evidence of Rhodes's actual knowledge of Amegy Bank's prior perfected security interest and, hence, no direct evidence of Rhodes's actual knowledge "that

12

the action of [Johnson was] wrongful." *See* O.C.G.A. § 11-8-115 cmt. n.5.

Alex.Brown argues that Amegy Bank's reliance on a constructive knowledge or

failure to investigate theory of liability, is not sufficient to overcome Alex.Brown's

securities intermediary immunity. *See id.* § 11-8-115.  Amegy Bank, however, did

not rely upon such a theory at trial.  Amegy Bank argued that its evidence was

sufficient for the jury to *infer* that Rhodes actually knew that Johnson's conduct—

redeeming the partnership interest and liquidating the stock—constituted

conversion.  Moreover, the jury instruction required a finding of actual knowledge,

not constructive knowledge or willful ignorance, to defeat section 11-8-115

immunity.  *See Johnson v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002) ("[W]e

must presume that juries follow their instructions.").  The question, then, is

whether a jury reasonably could infer from the record that Alex.Brown had actual

knowledge that the partnership interest and the HINC stock were subject to a prior

security agreement, and that their alienation violated the terms of that agreement.

We think that it could.

　　A number of factors, especially when considered together, support an

inference that Alex.Brown, through Rhodes, had actual knowledge of Amegy

Bank's prior perfected security interest and the wrongfulness of Johnson's conduct.

First, Rhodes and Johnson had a pre-existing, ten-year-long, professional and, at

least incidentally, social relationship.  When Johnson helped Rhodes refinance

13

properties with $11.5 million dollars in loans funded through Deutsche Bank PWM, he did his due diligence.  He analyzed Johnson's liquidity and the availability of the HLP partnership interest as a source of repayment for the Deutsche Bank PWM loan in the event of a default.  A reasonable jury could infer that the professional and social aspect of the relationship led the two to discuss such matters even where those matters did not bear directly on their professional conduct.  Rhodes was primarily responsible for extending the Deutsche Bank PWM loans to Johnson and, as a result, obtained access to much of Johnson's financial information.  This access included Rhodes's participation in the Know Your Customer report process, a report that Rhodes reviewed and certified was "complete and accurate."  Though the Know Your Customer report totaled over 1,000 pages, the reference to Amegy Bank's security interest appeared near the beginning, on page 14.  Rhodes testified that he did not learn of the security interest during the Deutsche Bank PWM loan investigation, but Rhodes's previous representations that the Know Your Customer report was complete and accurate and the placement of the security interest reference near the beginning of the Johnson Know Your Customer report tend to belie this testimony.  Rhodes even received a substantial commission for his assistance in originating the PWM loans (40% of the $58,000.00 commission), which would give him a hefty financial

14

interest in keeping Johnson's account current. Before opening a margin account for Johnson, Alex.Brown and Rhodes again investigated his financial situation.

Rhodes's fast-paced unloading of the HINC stock further supports an inference of actual knowledge. The fact that Johnson called Rhodes twenty-four minutes after Bobo sent an email to Amegy Bank falsely representing that Johnson continued to hold the HLP partnership interest and was prepared to bring the Amegy Bank loan current indicates some likelihood that Alex.Brown, through Rhodes, was aware of the wrongfulness of Johnson's actions. Rhodes testified at trial that he failed to recall the content of the telephone conversation, but his haste in setting up the margin account immediately after the call impeaches his credibility. Johnson's request to have the HINC stock certificate overnighted to his office further indicates Alex.Brown's participation in and knowledge of wrongful conduct through Rhodes. Rhodes's suspicious conduct includes: selling the HINC stock on the day it was delivered without reviewing the certificate for restrictions (though there were none); personally driving to Johnson's office to complete the transaction; and the next-day wiring of the proceeds from the sale of the HINC stock into Johnson's JPMorgan Chase Bank account. The jury was entitled to infer from this sequence of events that Rhodes not only had a motive to apprise himself of the details of Johnson's finances, including the Amegy Bank security interest and its prohibition on transfer of the HLP partnership interest, but actually did so.

15

We have held that circumstantial evidence similar to what we have here can support an inference of actual knowledge. In *Avenue CLO Fund, Ltd. v. Bank of America, N.A.*, a panel of this court reversed a district court's grant of summary judgment based on its determination that "circumstantial evidence create[d] a genuine issue of material fact with respect to whether [the defendant] had actual knowledge" of particular facts, when such knowledge would have put the defendant in breach of its contract with the plaintiff. *See* 723 F.3d 1287, 1297 (11th Cir. 2013). There, the plaintiff had to prove that the defendant had actual knowledge of facts constituting a failure to satisfy conditions precedent to a disbursement agreement, including the condition that a specific third-party lender fund the project. *See id.* at 1296. In concluding that there was a genuine issue of material fact regarding actual knowledge, we cited (1) correspondence alerting the defendant to the lender's impending bankruptcy and "suggesting" that a third-party borrower had made payments in place of the lender, (2) testimony by an individual not employed by the defendant "suggesting that it was possible that he informed" the defendant about the improper payments, (3) a meeting where the defendant's executives discussed the implications of the impending bankruptcy of the lender whose advances were required to fund the project under the disbursement agreement, and (4) the borrower's "suspicious evasiveness on the topic of [the

16

lender's] bankruptcy and its nonresponsive answers to [the defendant's] questions about who funded [the lender's] share of the" advance in question. *See id.* at 1297.

Thus, in *Avenue CLO Fund*, the plaintiff presented no direct evidence of the defendant's actual knowledge; at best, the plaintiff presented direct evidence of constructive knowledge, willful blindness, or failure to investigate. *See id.* While none of those three levels of culpability would have been sufficient to find in favor of the plaintiff, we held that a reasonable jury could reach the conclusion that the defendant had actual knowledge of the relevant facts because the evidence, though not direct, could support such an inference. *See id.* at 1296–97.

When considering a Rule 50(b) motion, it is the duty of the district court, and this court on de novo review, to construe the evidence in the light most favorable to the non-moving party. *See Gowski*, 682 F.3d at 1310–11. We have held that a jury is entitled to totally disregard direct evidence and credit contradictory evidence that was exclusively circumstantial. *See Acoff*, 762 F.2d at 1548 (permitting jury to reach a conclusion in conflict with direct evidence based solely on circumstantial evidence).

It should not be a surprise that the jury was forced to rely on purely circumstantial evidence to conclude that Alex.Brown had actual knowledge of Johnson's wrongful conduct. It is difficult to imagine what sort of evidence, other than an admission by Rhodes, would constitute direct evidence of Alex.Brown's

knowledge of Johnson's wrongful conduct.  *See United States v. Santos*, 553 U.S. 507, 521, 128 S. Ct. 2020, 2029 (2008) ("[Knowledge] will be provable (as knowledge must almost always be proved) by circumstantial evidence."); *cf. Wright v. Southland Corp.*, 187 F.3d 1287, 1295 n.9 (11th Cir. 1999) (noting that testimony by a third party that a decisionmaker stated that he fired an individual because of her sex "would be direct evidence of the fact that the decisionmaker made the alleged statement . . . [but] merely circumstantial evidence of the" decisionmaker's state of mind); *see also Colonial Stores, Inc. v. FTC*, 450 F.2d 733, 744–45 (5th Cir. 1971) (noting the necessity of proving actual knowledge through circumstantial evidence "since the only direct evidence of a state of mind must come from the testimony of the individuals who have broken the law").[7]

Ultimately, Rhodes, Alex.Brown's wealth advisor, took the stand and testified that he did not have actual knowledge of Amegy Bank's security interest, but the jury obviously did not believe him and was entitled to infer the complete opposite.  Rhodes had the Know Your Customer report in his hands before completing the Deutsche Bank PWM loan; Rhodes helped Johnson dispose of the HINC stock with deliberate speed—the emails admitted into evidence paired with the timeline show that Rhodes rushed the HINC stock sale through before Amegy

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Bank was able to find out about it.  Rhodes wrote a letter to his boss confirming that he had reviewed the entire Know Your Customer report, which referenced the Host stock, and he told his boss that it was "accurate"; Rhodes had a financial interest in the transaction, making 40% of $58,000 on the deal; to sell the HINC stock, Johnson had the stock certificate overnighted to Johnson's address; Rhodes then drove and picked it up himself; Rhodes was intimately aware of Johnson's financial situation, and Rhodes and Johnson were business partners and friends for over ten years.  The jury is better able than we are to assess Rhodes' credibility, and it did not buy Rhodes' testimony that he had no knowledge of the prior Amegy Bank lien.  "When the resolution of the case boils down to credibility, the trial judge must allow the jury to function." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558 (11th Cir. 1984).  The district court did just that here; it allowed the jury to function in permitting the jury's inferences to stand, understanding that the "trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow." *See id.* at 1559.  Furthermore, our ability as an appellate court to set aside a jury verdict is more constrained; as we said in *Owens*, "[a]ppellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony." 698 F.2d at 1113.  We find, therefore, that the jury had a legally sufficient basis for

19

concluding that AB had actual knowledge of Johnson's wrongful conduct, and that the denial of the motion for judgment as a matter of law was not reversible error.

### b.

Alex.Brown also maintains that Amegy Bank did not present sufficient evidence to support the second element required to defeat section 11-8-115 immunity under a collusion theory—that Alex.Brown gave Johnson substantial assistance or encouragement to commit the conversion. Alex.Brown substantially assisted Johnson by carrying out the sale of the HINC stock and wiring the proceeds to Johnson's JPMorgan Chase Bank account. Even if a securities intermediary's role is typically too ministerial to "reach[] a level of affirmative misconduct" amounting to collusion, *see* O.C.G.A. § 11-8-115 cmt. n.5, the evidence here supports the inference that Alex.Brown engaged in such affirmative misconduct by knowingly and actively taking part in the scheme to convert Amegy Bank's collateral, rather than acting as a mere conduit. Rhodes's interest in maintaining his professional relationships with both Deutsche Bank PWM and Johnson, as well as the quick turnaround of the transaction—setting up the margin account, personally picking up the certificate from Johnson's office, selling the HINC stock without reviewing the certificate, and wiring the proceeds to Johnson's JPMorgan Chase Bank account the next day—support the jury's inference that Alex.Brown affirmatively assisted Johnson in the conversion with

20

the purpose of preserving Rhodes's relationships with Deutsche Bank PWM and Johnson. Therefore, Amegy Bank presented sufficient evidence of Alex.Brown's actual knowledge of Johnson's misconduct and Alex.Brown's substantial assistance in that misconduct to support the jury's verdict.

2.

We turn to the trial judge's denial of the request for punitive damages. We review that denial de novo. *Gowski*, 682 F.3d at 1311; *see also Boyd v. Homes of Legend, Inc.*, 188 F.3d 1294, 1298 n.9 (11th Cir. 1999) ("Whether punitive damages are recoverable presents a pure question of law; thus, we review de novo the district court's resolution of the issue."). Alex.Brown argues that punitive damages are only appropriate in Georgia where the defendant acts with the specific intent of harming the plaintiff. That is an incorrect statement of Georgia law.

In Georgia, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). The last of these—"want of care which would raise the presumption of conscious indifference to consequences"—falls short of specific intent. Moreover, under applicable Georgia law, an action for conversion generally supports punitive damages. *See Taylor v. Powertel, Inc.*, 551

21

S.E.2d 765, 768 (Ga. Ct. App. 2001) ("Action[s] for trover or for conversion are intentional torts and as such come within [section] 51-12-5.1(b)."). Therefore, we affirm the denial of the motion as to punitive damages.

### B.

Finally, we reach Alex.Brown's Rule 59 alternative motion for a new trial. We review the denial of such a motion for abuse of discretion. *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n.16 (11th Cir. 2009). Underlying legal error constitutes an abuse of discretion. *Woodard v. Fanboy, LLC*, 298 F.3d 1261, 1268 n.14 (11th Cir. 2002).

First, as to the purportedly inconsistent jury verdict, Alex.Brown did not object to it before the jury was discharged and has therefore waived that argument. *See Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1225 (11th Cir. 2012).

Second, the jury instructions as to the collusion definition did not constitute an abuse of discretion. Alex.Brown essentially complains that the instructions are not sufficiently thorough. However, the precedent to which it cites does not support reversal for lack of thoroughness; those opinions reversed the district court where the instructions *misled* the jury. *See Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287–88 (11th Cir. 1998) (reversing the district court where it "did not offer a clarifying instruction and instead informed the jury that it could give the

evidence in question whatever weight it deemed appropriate" despite evidence "that the jury was focusing on a non-issue and possibly did not understand the precise burden of proof"); *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 825–26 (11th Cir. 1992) (reversing where the district court (1) erroneously instructed the jury that patent danger and product misuse defenses were absolute bars to liability, and (2) misled the jury by instructing on product misuse because it was a non-issue).

Third, the district court's instruction regarding the valuation of damages was not in error. Alex.Brown cites to a number of Georgia state court opinions, as well as a secondary source, to support its contention that O.C.G.A. § 44-12-152,[8] which the district court relied on in formulating the damages instruction, applies only where the defendant in a conversion action retains the property at least until the commencement of the trial. However, Alex.Brown incorrectly construes that authority. A complete reading of those decisions demonstrates that they hold that section 44-12-152 does not apply where the plaintiff has regained possession of the property in question before trial. *See Lamb v. Salvage Disposal Co. of Ga.*, 535 S.E.2d 258, 261 (Ga. Ct. App. 2000) ("[I]n an action for conversion, the measure of damages as set forth in [section] 44-12-152 applies only when the property

---

[8] "For personalty unlawfully detained, the plaintiff may recover a sum in the amount of the highest value which he is able to prove existed between the time of the conversion and the trial." O.C.G.A. § 44-12-152.

23

continues to be 'unlawfully detained.'  When a party elects to sue for damages for conversion and the property *has been returned* before trial, . . . the damages are limited to recovery for the diminution in value of the property only for the time period between the alleged conversion and the property's return." (emphasis added) (citations and internal quotation marks omitted)); *Walker v. Crane*, 534 S.E.2d 520, 523 (Ga. Ct. App. 2000) ("*By the return of the property*, the [plaintiffs] were precluded from the recovery of damages other than loss of hire and diminution in value between conversion and return of the property." (emphasis added)); Charles R. Adams III, Georgia Law of Torts § 2:7 (citing *Campbell v. Bausch*, to support the proposition that section 44-12-152 is limited to "the highest proved value while the property was in the defendant's possession," where *Campbell* states, "[W]e could not agree with appellant that [section] 44-12-152 applies once the property has been *returned to its rightful owner*."  395 S.E.2d 267, 269 (Ga. Ct. App. 1990) (emphasis added)).  Thus, under Georgia law, in a suit for damages for conversion, section 44-12-152 gives us the damages calculus unless the plaintiff has regained the property that is the object of the lawsuit.[9] Accordingly, the district court did not err in instructing the jury that section 44-12-152 provided the appropriate measure of damages.

---

[9] It seems that the reason for this limitation on the application of section 44-12-152 is to prevent a double recovery, not to allow a defendant to limit its exposure for its wrongful conduct. AB attempts to use section 44-12-452 for the latter purpose.

Consequently, because Alex.Brown is unable to demonstrate underlying legal error, we find no abuse of discretion in denying Alex.Brown's request for a new trial.

## III.

Because Amegy Bank presented sufficient evidence for a jury to infer that Alex.Brown colluded with Johnson to convert Amegy Bank's collateral, and because the proceedings below are otherwise free of reversible error, we affirm.

**AFFIRMED.**

RIPPLE, Circuit Judge, dissenting:

After reviewing the evidence presented at trial, I respectfully part company from the majority's determination that the jury's verdict should stand. Amegy offered no evidence, circumstantial or direct, to support the jury's determination that Alex.Brown knew about Amegy's interest in the Host Hotels stock or that Alex.Brown engaged in affirmative misconduct in completing Johnson's securities transaction. I therefore would reverse the district court's decision denying Alex.Brown's motion for judgment as a matter of law.

Reversal of a jury verdict is not a matter to be undertaken lightly; the Federal Rules of Civil Procedure stringently circumscribe our review. As the majority appropriately recognizes, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[1] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)). We must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that

---

[1] For the majority, this case "boils down to credibility." Majority Op. at 19 (internal quotation marks omitted). I respectfully disagree. We must determine whether Amegy presented sufficient circumstantial evidence to allow a reasonable jury to find that Alex.Brown had actual knowledge of Amegy's interest in the Host Hotels stock. As discussed more fully below, I believe that we must reverse the district court's decision regardless of the jury's credibility determination about Rhodes's testimony.

that evidence comes from disinterested witnesses." *Id.* at 151, 120 S. Ct. at 2110

(internal quotation marks omitted); *accord Christopher v. Florida*, 449 F.3d 1360,

1364 (11th Cir. 2006).

### A.

Alex.Brown contends that, as a securities intermediary, it is immunized from

liability by O.C.G.A. § 11-8-115, Georgia's enactment of U.C.C. § 8-115. This

section of the Uniform Commercial Code provides that a securities intermediary is

not liable to a person having an adverse claim to a financial asset unless the

intermediary "[a]cted in collusion with the wrongdoer in violating the rights of the

adverse claimant."[2]  O.C.G.A. § 11-8-115(2).

---

[2] Section 11-8-115 provides, in full:

> A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a financial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the securities intermediary, or broker or other agent or bailee:
>
> > (1) Took the action after it had been served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order, or other legal process; or
> >
> > (2) Acted in collusion with the wrongdoer in violating the rights of the adverse claimant; or
> >
> > (3) In the case of a security certificate that has been stolen, acted with notice of the adverse claim.

O.C.G.A. § 11-8-115.

27

To determine whether an intermediary's conduct amounts to collusion, the U.C.C. employs a standard "akin to" the aider or abettor standard under the Restatement (Second) of Torts § 876.[3]  O.C.G.A. § 11-8-115 cmt. 5; *see also* Majority Op. at 11–12 (reproducing text of § 876).  The official comments to the U.C.C. provide additional guidance for interpreting and applying the collusion test in § 8-115.[4]  These comments explain that "[k]nowledge that the action of the customer is wrongful is a necessary but not sufficient condition of the collusion

---

[3] Courts generally agree that constructive knowledge is insufficient to establish liability under § 876.  *See, e.g.*, *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (noting that the plaintiff must show that the defendant "had '*actual* knowledge' of any breach" (emphasis in original)); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (noting "that actual knowledge is required" for aider and abetting liability under New York law); *Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 82 (1st Cir. 2001) ("The magistrate judge, following the majority of jurisdictions recognizing this tort, concluded that Invest Almaz had to prove that Temple-Inland had actual knowledge that Pathex was breaching a duty to Invest Almaz."); *see also* 109 Am. Jur. Proof of Facts 3d 319 § 9 (2009) ("Actual knowledge is required; constructive knowledge generally will not sustain this element.").  *But cf. Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 283 (2d Cir. 1992) (holding that "constructive knowledge suffices" to establish knowledge of a fiduciary's breach of duty and citing § 876); *see Invest Almaz*, 243 F.3d at 83 (refusing to apply *Diduck* because "the constructive knowledge standard adopted in that case reflected unique factual and policy considerations not relevant here" and noting that "the court looked to trust case law and provisions of the *Restatement of Trusts* in devising its constructive knowledge rule").  Indeed, even the cases upon which Amegy relies recognize that Amegy's theory of liability is faulty.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) ("We stress that the requirement is *actual* knowledge . . . ." (emphasis in original)).

[4] Both this court and Georgia courts recognize that the official comments to the U.C.C. shed substantial light on a provision's meaning.  *See Weathersby v. Gore*, 556 F.2d 1247, 1256 (5th Cir. 1977) (recognizing that U.C.C. official comments "are by far the most useful aids to interpretation and construction" (internal quotation marks omitted)); *Sun v. Mercedes Benz Credit Corp.*, 562 S.E.2d 714, 717 (Ga. Ct. App. 2002); *Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.*, 171 S.E.2d 643, 645 (Ga. Ct. App. 1969) (noting that when the Georgia legislature adopts a U.C.C. provision verbatim, "the intentions of the drafters of the [U.C.C.] as evidenced in the official comments to the [U.C.C.] should be given due consideration").

test." O.C.G.A. § 11-8-115 cmt. 5.  The U.C.C. defines "knowledge" as actual

knowledge.  *See id.* § 11-1-201(25).  Even if an intermediary is aware of an

adverse claim, it has no duty to investigate.  As the comments explain, "[i]t is not

the role of the record-keeper to police whether the transactions recorded are

appropriate, so mere awareness that the customer may be acting wrongfully does

not itself constitute collusion."  *Id.* § 11-8-115 cmt. 5.  The examples provided in

the official comments make clear that, even if a securities intermediary has actual

knowledge that a person asserts a claim to the securities, the intermediary is

insulated from liability.[5]  The comment also sets forth the policy reasons for such a

rule:

> Even though a firm has notice that someone asserts a claim to a
> customer's securities or security entitlements, the firm should not be
> placed in the position of having to make a legal judgment about the
> validity of the claim at the risk of liability either to its customer or to
> the third party for guessing wrong.  Under this section, the broker or
> securities intermediary is privileged to act on the instructions of its
> customer or entitlement holder, unless it has been served with a
> restraining order or other legal process enjoining it from doing so.

*Id.* cmt. 3.

The comments further explain that an intermediary is only liable "in

egregious cases where its action goes beyond the ordinary standards of the

business of implementing and recording transactions, and reaches a level of

---

[5] Specifically, examples three and four indicate that when an adverse claimant calls an intermediary, informs it of its interest, and demands that the intermediary not trade the securities, the intermediary still may be protected.  *See* O.C.G.A. § 11-8-115 cmt. 3.

affirmative misconduct in assisting the customer in the commission of a wrong."

*Id.* cmt. 5. It is only when "the conduct of a securities intermediary . . . rises to a

level of complicity in the wrongdoing of its customer or principal[ that] the

policies that favor protection against liability do not apply."[6] *Id.*

In sum, to succeed in an action for conversion against a securities

intermediary, a plaintiff must show collusion by proving (1) that the intermediary

had actual knowledge that the action of the customer was wrongful, and (2) that the

intermediary engaged in affirmative misconduct in assisting the customer in the

commission of the wrong. We therefore must determine whether the jury was

presented with sufficient evidence from which it reasonably could conclude that

Alex.Brown had actual knowledge that Johnson's sale of the Host Hotels stock was

wrongful and that Alex.Brown engaged in affirmative misconduct in assisting

Johnson in selling the Host Hotels stock.

**B.**

---

[6] The parties rely on cases applying the general aider and abettor standard from Restatement (Second) of Torts § 876 to analyze the requirements under U.C.C. § 8-115. Although these cases are often helpful, the U.C.C. adopted a standard "akin to" the § 876 standard, *see* O.C.G.A. § 11-8-115 cmt. 5, and the comments make clear that more than actual knowledge is required to impose intermediary liability, *see id.* cmts. 3, 5; *see also* 8 David Frisch, Lawrence's Anderson on the Uniform Commercial Code § 8-115:9 (3d ed. 1996) (suggesting that "the collusion exception will be interpreted to apply only when the customer and the conduit *know that their action violates rights of an adverse claimant* and join together with the intention to produce that violation or act with reckless indifference to the fact that the violation will occur" (emphasis added)). Accordingly, to the extent that those cases interpreting § 876 require something other than actual knowledge or impose a lesser burden than that required under § 8-115(2), the cases are inapposite.

## 1.

We turn first to the requirement that Amegy prove that Rhodes had *actual* knowledge of Amegy's interest in the Host Hotels stock.  The record makes clear that Amegy's assertion that Rhodes had actual knowledge of Amegy's lien on the Host Hotels stock is without *any* support.  Indeed, on appeal, Amegy never acknowledges that it must prove *actual* knowledge; it merely repackages the same arguments that it made in the district court to establish that the jury heard ample circumstantial evidence to allow it to find Alex.Brown liable for collusion under § 8-115.[7]

The evidence presented at trial included the KYC report, which contained a reference to Amegy's lien on *unnamed* property owned by Johnson, and Rhodes's testimony that he was not aware of Amegy's lien on the Host Hotels stock prior to the commencement of this litigation.  The parties also presented evidence that the redemption of the Host Hotels partnership units and the sale of the resulting stock occurred while Johnson was in default on his Amegy loan; that Rhodes

---

[7] Contrary to the majority's assertion, Amegy also contends that it did not need to prove that Alex.Brown had actual knowledge of Amegy's lien.  Amegy relies on *Banner Bank v. First Community Bank*, 854 F. Supp. 2d 846, 857 (D. Mont. 2012), for the proposition that "willful ignorance satisfies the collusion exception."  Appellee's Br. 40 (internal quotation marks omitted).  However, § 8-115 does not incorporate the willful blindness test, unlike other provisions of the U.C.C.  *Cf.* O.C.G.A. § 11-8-105 cmt. 4 (noting that, by providing "that a person has notice of an adverse claim if the person is aware of a significant probability that an adverse claim exists and deliberately avoids information that might establish the existence of the adverse claim," § 105 "intended to codify the 'willful blindness' test").  As described above, § 8-115 requires that a securities intermediary have actual knowledge of a customer's wrongful conduct.

31

communicated with Johnson and his assistant in the time leading up to the sale of the Host Hotels stock while, at the same time, Johnson was in contact with Amegy; that Rhodes told his assistant that Johnson's account had to be set up fast; that Rhodes sold the stock before the certificate had been delivered; that Rhodes opened Johnson's account with the stated objectives of "Growth" and "Capital Appreciation" but, after the close of the sale, the proceeds immediately were wired to Johnson; that Rhodes had a long-term relationship with Johnson; and that Rhodes profited from the sale through the receipt of a commission.

These facts hardly permit a rational decision maker to conclude that Alex.Brown, acting through Rhodes, had actual knowledge of Amegy's interest in the Host Hotels stock at the time Johnson sold it. Consequently, there is no evidence that Alex.Brown knew that Johnson's conduct was wrongful. First, the fact that Amegy filed a UCC-1 financing statement does not establish that Alex.Brown had actual knowledge of Amegy's interest in the Host Hotels stock. Section 8-105(e) of the U.C.C. expressly provides that the "[f]iling of a [UCC-1] financing statement under Article 9 of this title is not notice of an adverse claim to a financial asset." O.C.G.A. § 11-8-105(e).[8] If the filing of a financing statement were sufficient to establish an intermediary's knowledge of an adverse claim, the

---

[8] "'Adverse claim' means a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset." O.C.G.A. § 11-8-102(a)(1).

actual knowledge requirement under § 8-115 would be transformed into a constructive knowledge standard, and securities intermediaries would be required, contrary to the specific language of the statute, to investigate in depth their customers and the antecedent business affairs of those customers. The evidence clearly demonstrates that the KYC report provided to Rhodes did not show that Amegy had a lien on the Host Hotels stock. For the U.C.C. financing statement to supply the knowledge required under § 8-115, Alex.Brown would have had to review the actual filing. However, there is no evidence that Rhodes ever reviewed, or indeed had any reason to review, the UCC-1 financing statement.

The remaining evidence relied upon by Amegy only supports the contention that Alex.Brown could have known that Amegy had an interest in the Host Hotels stock. There is no question that Alex.Brown never had a duty to investigate beyond the KYC report. What Alex.Brown could have known about Amegy's interest simply does not satisfy the actual knowledge requirement under § 8-115. *See* O.C.G.A. § 11-8-115 cmt. 5.[9]

---

[9] *See also El Camino Res. Ltd. v. Huntington Nat'l Bank*, 712 F.3d 917, 923 (6th Cir. 2013) (holding that, although a bank had "a strong suspicion of wrongdoing" by its customer, it did not have the actual knowledge required to be liable as an aider and abettor); *Aetna Cas. & Sur. Co.*, 219 F.3d at 536 ("We stress that the requirement is *actual* knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice." (emphasis in original)); *cf. ComTran Grp., Inc. v. United States Dep't of Labor*, 722 F.3d 1304, 1308 (11th Cir. 2013) ("An example of actual knowledge is where a supervisor directly sees a subordinate's misconduct. An example of constructive knowledge is where the supervisor may not have directly seen the subordinate's misconduct, but he was in close enough proximity that he should have." (citation omitted));

The majority suggests several possible inferences that, in its view, support the jury's verdict. It first suggests that a reasonable jury could infer that, based on their relationship, Johnson and Rhodes might have discussed Amegy's interest in the Host Hotels stock, "even where those matters did not bear directly on their professional conduct." Majority Op. at 14. Second, the majority suggests that a jury possibly could infer that Rhodes's review of the KYC report might have led him to investigate Amegy's lien, and, consequently, he might have discovered Amegy's interest in the Host Hotels stock. Third, the majority suggests that a jury could infer that Rhodes, because of his relationship to Johnson, might have become "aware of the wrongfulness of Johnson's actions." *Id.* at 15. And finally, the majority states that a jury could infer that, because Rhodes followed his client's direction to set up a trading account and execute the stock sale quickly, he must have "had a motive to apprise himself of the details of Johnson's finances" and must have actually done so. *Id.* A critical examination of the majority's

---

*Shacket v. Philko Aviation, Inc.*, 841 F.2d 166, 171 (7th Cir. 1988) (noting that implied actual notice, which "requires (1) actual knowledge of (2) highly suspicious circumstances, coupled with (3) an unaccountable failure to react to them," is not the equivalent of actual knowledge); *In re Agape Litig.*, 681 F. Supp. 2d 352, 363–64 (E.D.N.Y. 2010) (holding that "red flags" only established constructive knowledge); *Mukamal v. BMO Harris Bank N.A.* (*In re Palm Beach Fin. Partners, L.P.*), 488 B.R. 758, 773 (Bankr. S.D. Fla. 2013) ("[T]he Plaintiff fails to recognize that implied actual notice is also not the same as actual knowledge. In fact, implied actual notice is defined as notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not [use], or as it is sometimes called implied actual notice." (second alteration in original) (internal quotation marks omitted)).

34

suppositions simply will not support the legal liability that it wishes to impose on Alex.Brown.

As a threshold matter, the majority's suppositions are based on several factual inaccuracies. It states that Rhodes "analyzed Johnson's liquidity and the availability of the HLP partnership interest as a source of repayment for the Deutsche Bank PWM loan in the event of a default." *Id.* at 14; *see also id.* 3–4 (stating that "Rhodes analyzed Johnson's liquidity and determined that the same HLP partnership interest subject to the Amegy Bank loan could be a source of repayment for the Deutsche Bank loans in the event of default"); *id.* at 19 (stating that "Rhodes was intimately aware of Johnson's financial situation"). This assertion is unsupported by the record. Instead, the record reflects that DB Private Wealth Mortgage ("PWM") generated a credit memorandum that listed the Host Hotels units among Johnson's assets. The memorandum affirmatively states that there were "[n]o loans outstanding and/or no debt" on the units.[10] More fundamentally, the parties do not contend that Rhodes or Alex.Brown had access to

---

[10] R.73-35.

the credit memorandum.[11]  Indeed, the evidence presented at trial indicates that Rhodes never saw the credit memorandum.[12]

The majority similarly asserts that "Rhodes again investigated [Johnson's] financial situation" "[b]efore opening a margin account for [him]."  *Id.* at 14–15.  That assertion also is unsupported by the record.  In its closing argument, Amegy conceded that Rhodes and Alex.Brown "did nothing to investigate the very information that they had in their file."[13]  The record instead simply suggests that Rhodes could have investigated further Johnson's financial situation—an obligation not placed on him by the governing statute.[14]

The majority further states that Rhodes's "substantial commission" "g[a]ve him a hefty financial interest in keeping Johnson's account current."  *Id.* at 14.

---

[11] *See* Appellee's Br. 7 (recognizing that it was "PWM [that] analyzed Johnson's liquidity").

[12] *See* R.214 at 58 (testimony of Chris Barsi, PWM vice-president, that Rhodes would not have received the credit memorandum and that the memorandum was not included in the KYC report).

[13] R.216 at 41.  Amegy submitted that Alex.Brown failed to investigate because "they don't care about Texas banks" and "[t]hey certainly don't care about [Amegy]."  *Id.*  Instead, Alex.Brown was "more concerned with getting paid."  *Id.*  While Alex.Brown's conduct may be objectionable, it does not allow a jury to infer that, by failing to investigate, it is liable as though it had known about Amegy's security interest.

[14] Indeed, the majority twice relies on Rhodes's "access" to Johnson's financial information.  *See* Majority Op. at 14 (noting that Rhodes "obtained access to much of Johnson's financial information"); *id.* at 15 (noting that "Rhodes again investigated [Johnson's] financial situation").

To the extent that the majority concludes that, because Rhodes had the opportunity to review Amegy's financing statement after viewing the KYC report, the jury may infer that he did so, it effectively adopts a constructive knowledge standard.

The record also does not support that conclusion. Although Rhodes received approximately $23,000 as a commission for originating Johnson's loan, there is no indication that his ability to retain that commission depended on Johnson's repayment of the loan. Simply stated, the evidentiary record fails to support the majority's conclusions.

Turning to the majority's substantive assertions, one over-arching flaw dominates its presentation: it never explains how the factors on which it relies would allow a jury to infer that Rhodes had *actual* knowledge of Amegy's interest. How, for example, does the pre-existing relationship between Rhodes and Johnson allow a jury to infer that they must have discussed the intricacies of Amegy's lien? Surely, in most circumstances, a securities intermediary develops a relationship with clients. Such a relationship hardly allows a jury to conclude that the client actually told his broker about all the wrongful conduct of his business career.

The majority also concludes that, because "Johnson called Rhodes twenty-four minutes after Bobo sent an email to Amegy Bank falsely representing that Johnson continued to hold the HLP partnership interest," a jury could infer—rationally—that Rhodes "was aware of the wrongfulness of Johnson's actions." *Id.* at 15. How the proximity of *Johnson's* phone call with his lawyer and *Johnson's* contacting his broker permit the conclusion that Rhodes, the broker, was aware of the wrongfulness of Johnson's actions with Bobo is never explained. Careful

37

analysis demonstrates starkly the lack of substance to the majority's position. All this circumstantial evidence establishes is that, on that day, Johnson may have been up to no good. It hardly suggests that he told his broker all about it.

Amegy's argument is simple. Too simple. It suggests that the timing and sequence of events provided circumstantial evidence of Alex.Brown's knowledge. Johnson's assistant, Martin, emailed Rhodes twenty-four minutes after Johnson had "receiv[ed] notice from his attorney that he had ten days to make his delinquent payment to Amegy."[15] Rhodes later emailed Martin, telling her to let him know if she needed any help, and emailed his own assistant, instructing her to take Johnson's KYC report and set up a trading account, stating that he needed it done fast. Based on those emails, Amegy submits that the jury was entitled to infer that Rhodes knew that Amegy had a *present* security interest in the Host Hotels stock and that, by selling the stock, Johnson was violating his security agreement with Amegy. Nothing in this rather prosaic sequence of events between a customer and his securities intermediary contains a whisper of an echo of any wrongdoing.[16]

---

[15] Appellee's Br. 41.

[16] To support its timing argument, Amegy relies on *SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438 (2d Cir. 2004), a case that has nothing to do with § 8-115. In *Credit Bancorp*, the Second Circuit addressed whether a securities intermediary had an awareness of an adverse claim under U.C.C. § 8-105. *See id.* at 448 ("At issue in this appeal is whether Deutsche Bank had notice under U.C.C. § 8-105(a)(2)."); *see also* O.C.G.A. § 11-8-105(a)(2) (providing that a person has notice of an adverse claim if "[t]he person is aware of facts sufficient to indicate that

Finally, the majority relies on Rhodes's "suspicious conduct." *Id.* The majority does not explain, however, why Rhodes's conduct was suspicious. Nor does the record establish that Rhodes's conduct was in any way out of the ordinary. That Rhodes, a securities intermediary, was responsive to his client's needs certainly does not support an inference that he knew of his client's wrongful conduct and most certainly does not suggest that he cooperated in the client's wrongdoing. The factors on which the majority relies, which individually fail to support the jury's verdict, do not fare any better when viewed in the aggregate. The circumstantial evidence simply does not allow a jury to find that Alex.Brown actually knew that Amegy had a security interest in the Host Hotels stock.[17]

---

there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim"). The court held that the "chronology of events" suggested that the bank was aware of facts that indicated a significant probability of an adverse claim to the shares of stock at issue. *See Credit Bancorp, Ltd.*, 386 F.3d at 451. Because the bank was aware of those facts, it had a duty to investigate. *See id.* at 452–53. Unlike § 8-105, § 8-115 *does not* impose a duty to investigate when an intermediary is aware of facts that indicate a probability that an adverse claim may exist. Accordingly, even if the facts in the two cases were analogous, Amegy's reliance on *Credit Bancorp* is misplaced. The timing of Rhodes's phone call with Johnson therefore does not support an inference that Rhodes knew about Amegy's interest in the Host Hotels stock.

[17] To support the opposite conclusion, the majority relies on *Avenue Clo Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287 (11th Cir. 2013), another case that has nothing to do with § 8-115. The evidence presented in that case, however, highlights the dearth of evidence here. In *Avenue Clo Fund*, the plaintiff had to prove that Bank of America had actual knowledge that Fontainebleau had funded Lehman's payment. *See id.* at 1297. The plaintiff supplied evidence (1) that Bank of America received correspondence "suggesting" that Fontainebleau had made the payment in place of Lehman, (2) that an individual who knew that Fontainebleau had made Lehman's payment may have told Bank of America, (3) that Bank of America had attended a meeting with Fontainebleau where they discussed the implications of Lehman's bankruptcy, and (4) that Fontainebleau was "suspicious[ly] evasive[]" on the topic of Lehman's bankruptcy and

39

Here, in stark contrast to the irrelevant authorities relied upon by the majority and Amegy, nothing about Johnson's transaction independently indicates that it was wrongful. The evidence shows that Alex.Brown knew that Johnson wanted to sell the stock quickly. However, it is not wrongful, indeed it is commonplace, for a customer to request that its securities intermediary quickly carry out its transaction. Indeed, Rhodes testified that Johnson frequently

---

[provided] nonresponsive answers to Bank of America's questions about who funded Lehman's share of the September Advance." *Id.* The court concluded that, "taken together and viewed in the light most favorable to the [non-moving party], . . . this circumstantial evidence create[d] a genuine issue of material fact with respect to whether Bank of America had actual knowledge that Fontainebleau paid Lehman's share of the September Retail Advance." *Id.*

The decision of our colleagues in the Sixth Circuit in *Aetna Casualty & Surety Co.*, relied upon by Amegy even though it has nothing to do with § 8-115, also stands in marked contrast to the present situation and clearly demonstrates the lack of evidence here. The Sixth Circuit held that a reasonable jury could conclude that KeyBank, through its employee, knew that its customer, Leahey Construction Co. ("Leahey"), was engaging in tortious, fraudulent conduct. Leahey committed fraud by capitalizing a business through a short-term loan in order to receive bonding. The court noted that there was evidence that the bank had a prior relationship with Leahey, that the bank knew that Leahey would need funds, that the bank's documents revealed that it was informed by Leahey that the purpose of the loan was to obtain approval from a new bonding company, that the funds were requested for the end of the month, and that, although it was a thirty-day agreement, the bank expected the funds to be returned in two days. *See Aetna Cas. & Sur. Co.*, 219 F.3d at 535. The court relied on KeyBank's experience at processing loans for similar purposes, noting that, "as a bank officer who had previously processed loans for bonding purposes, he knew enough to realize that adding significant funds to a company's bank account for only a four-day period would not serve to meet a bonding company's capitalization requirements." *Id.* at 535–36. This conclusion was bolstered by the fact that "Leahey stressed to [KeyBank] that the funds would have 'to be there' at month-end, but would likely be returned to KeyBank immediately thereafter." *Id.* at 536. Accordingly, the bank knew the purpose for which the funds were being requested, and the nature of the transaction itself indicated that it was fraudulent. With access to this information, the jury reasonably could find that the bank knew that Leahey was engaging in tortious conduct.

40

requested that his transactions be carried out expeditiously.[18]  In the absence of

evidence that Alex.Brown knew of Amegy's security interest, the nature of the

transaction was insufficient to demonstrate to Alex.Brown that it was wrongful.

There is no similar evidence from which a trier of fact can infer that Rhodes ever

had any knowledge of Amegy's present security interest in the stock.  Instead, the

jury would have to infer that because Rhodes *could have* discovered Amegy's

interest if he had assumed a duty not imposed on him by law, it is likely that he did

obtain such knowledge and colluded with Johnson.

The majority also states that the jury was free to decide whether it believed

that Rhodes was telling the truth when he testified that he was not aware of

Amegy's lien.  At trial, Rhodes stated that he did not know that the shares of stock

that he sold "were identified in Amegy's security agreement and in Amegy's

UCC-1."[19]  He testified that he "never looked at a UCC until [Amegy's counsel]

showed [him] at a deposition."[20]  He then reiterated that, prior to his deposition, he

had "never seen the documents before."[21]  Although, as a general matter, a jury

---

[18] Rhodes testified that "he had done the exact identical transaction . . . , including the hurry up, get it done quickly," with Johnson while he was at Lehman Brothers, and that Johnson "was always like that."  R.214 at 219.

[19] *Id.* at 236.

[20] *Id.*

[21] *Id.* at 238.  Rhodes also testified that "[t]he broker dealer side doesn't run KYC reports the same way the bank does" and that he had never run a KYC report while he was at Alex.Brown.  *Id.* at 248.  He stated that the process used by brokerage firms is at "a much lower

41

may assess a witness's credibility, a jury's negative credibility determination, standing alone, cannot fill an evidentiary void. The Supreme Court has explained that "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966 (1984); *see also* Majority Op. at 9 (recognizing that a jury must "rely on circumstantial evidence to reach a conclusion in conflict with direct evidence").[22]

Accordingly, the jury could have found that Alex.Brown knew of Amegy's interest only if there was affirmative evidence contradicting Rhodes's testimony,

---

level because . . . we're not really worried about what [the customer's] liabilities are." *Id.* Rhodes further testified that, in reviewing the KYC report, he was responsible for reviewing "negative media." *Id.* at 249. He stated that, in reviewing the KYC report, he was "not experienced enough with UCCs or that to know" whether the U.C.C. lien information indicated that there was a lending relationship between Johnson and Amegy. *Id.* at 253.

[22] Pursuant to the Supreme Court's decision in *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S. Ct. 1949 (1984), we previously have recognized that a jury can "conclude the opposite of [a] witness's testimony . . . only if the record contains affirmative evidence of the opposite conclusion." *Smith v. Metro. Sec. Servs., Inc.*, 537 Fed. App'x 864, 869 (11th Cir. 2013) (per curiam). Our holding, albeit non-precedential, comports with the majority rule in the federal courts of appeals. *See Walker v. Waltham Hous. Auth.*, 44 F.3d 1042, 1049–50 (1st Cir. 1995) (noting "[m]ost of the authorities say that one side cannot carry its affirmative burden of proof on a fact by pointing to the possibility that the jury disbelieved the other side's denial of the fact"); 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2527 (3d ed. 2008) ("The party with the burden of proof does not make an issue for the jury's determination by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to the plaintiff's case occurred, the plaintiff cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event in question actually occurred.").

i.e., evidence that he had actual knowledge of Amegy's lien.  Because Amegy

failed to provide circumstantial evidence that would support a finding that

Alex.Brown had actual knowledge of Amegy's security interest, any determination

by the jury that Rhodes's testimony was incredible would have been

inconsequential.

## 2.

Amegy's inability to establish *actual* knowledge—an absolute requirement

if it is to prove its case—explains why it relies so heavily on constructive

knowledge, and failure to investigate theories, despite the stark reality that, under

the statute, these concepts simply cannot help it carry the day.  The record shows

that Amegy's position throughout trial was that Alex.Brown became, or should

have become, aware of Amegy's security interest in the Host Hotels collateral

when it obtained the KYC report—even though the KYC report did *not* identify the

property in which Amegy had an interest.  In its complaint, Amegy alleged that the

defendants, including Alex.Brown, had run a U.C.C. search on Johnson that

"revealed that Amegy was a secured creditor of Johnson pursuant to a UCC

Lien."[23]  In its pretrial statement, Amegy contended that the KYC report

"identified Amegy's security interest in the Partnership Units."[24]  In accordance

---

[23] R.60 at 5.

[24] R.112 at 3; *see also id.* at 5 (submitting that "Rhodes had received actual notice of Amegy's secured lien").

with its theory of liability, Amegy argued in its opening statement that its UCC-1 financing statement "put[] the world on notice of Amegy's claim" to the Host Hotels collateral.[25]  Amegy further submitted that once "you have the filing number of a UCC-1 financing statement, it takes you no more than two minutes to access it on the internet and you can see the UCC-1 financing statement."[26] Amegy submitted that, "incident to running [the] KYC report, Deutsche Bank was alerted to [Amegy's] UCC-1" financing statement.[27]  Amegy argued "that this was notice to Deutsche Bank [that] they *should* do something" and that the jury should "decide what they *should have* done."[28]  In summation, Amegy stated that, because the filing number, date, and other information in the KYC report revealed the UCC-1 financing statement that, if found and examined, identified the collateral, Alex.Brown "knew that there was this loan" and "knew it was secured."[29]  During closing argument, Amegy similarly argued that the KYC report showed the Amegy lien and that "the testimony is pretty clear that a mouse click away, and you *could have* actually pulled up the UCC-1 statement that delineated all of those six

---

[25] R.213 at 127.

[26] *Id.* at 127–28.

[27] *Id.* at 130.

[28] *Id.* (emphasis added).

[29] *Id.* at 131.

collateral that Amegy had for its loan that were on the UCC-1."[30]  It then argued

that "Rhodes didn't pick up the phone and call Amegy" and that Alex.Brown "did

nothing to investigate the very information that they had in their file."[31]

In short, unable to prove what the statute requires—actual knowledge—

Amegy attempts to make its case by imposing on Alex.Brown a duty that the

statute specifically does not impose on it—the duty to go behind the stock

transaction and investigate the propriety of its customer's motives.

## C.

Having established that the evidence does not support the finding that

Alex.Brown knew about Amegy's lien, I turn briefly to the second element of the

collusion standard under § 8-115.  In order to impose liability on a securities

intermediary, the U.C.C. requires that an intermediary's conduct be egregious and

go "beyond the ordinary standards of the business of implementing and recording

transactions," reaching the "level of affirmative misconduct in assisting the

customer in the commission of a wrong."  O.C.G.A. § 11-8-115 cmt. 5.  Amegy

submits that Johnson's transaction with Alex.Brown was atypical because

Alex.Brown quickly opened an account for Johnson, sold the Host Hotels stock

before it had physical possession of the stock certificate, and then immediately

---

[30] R.216 at 39–40 (emphasis added).

[31] *Id.* at 40–41.

wired all of the money to Johnson's account, even though the account was set up just days before.

There is no evidence in the record to support the finding that Alex.Brown's conduct went beyond the ordinary implementation of a securities transaction and rose to the level of affirmative misconduct.  Rhodes explained that it is "[e]xtremely typical" for him to sell stock without having physical possession of the stock certificate.[32]  He also testified that, if he fails to follow a customer's instruction to buy or sell stock, Alex.Brown is liable to the customer for any losses that result from the delay.  Amegy offered no evidence to rebut Rhodes's testimony or otherwise show that Alex.Brown affirmatively acted to convert the Host Hotels stock.  Alex.Brown simply followed the requests of its customer in executing a securities transaction.

### D.

Finally, I stress the significance of the majority's decision and its profound impact on the financial industry.  The drafters of the U.C.C. recognized that

> [i]t is essential to the securities settlement system that brokers and securities intermediaries be able to act promptly on the directions of their customers.  Even though a firm has notice that someone asserts a claim to a customer's securities or security entitlements, the firm should not be placed in the position of having to make a legal

---

[32] R.215 at 94; *accord id.* at 151.  He concluded that he "follow[ed] standard recognized business practices during the process of selling Mr. Johnson's shares and . . . the funds being wired out to his account in JP Morgan Chase."  *Id.* at 119.

judgment about the validity of the claim at the risk of liability either to its customers or to the third party for guessing wrong.[33]

O.C.G.A. § 11-8-115 cmt. 3.  Accordingly, in enacting the U.C.C., the Georgia legislature, as have other states that have enacted this section of the Uniform Code, sought to protect securities intermediaries and the securities industry from unnecessary, costly interference and delay.  It specifically refused to impose on intermediaries, except in narrow circumstances, the burden of investigating adverse claims to the stock in the transactions that they execute.  It opted, instead, to establish a formidable evidentiary burden for establishing liability, a burden that allows intermediaries to follow their customers' instructions and ensures that the securities trades are executed efficiently.

The burden that today's decision imposes on securities intermediaries is clear.  It puts intermediaries in the impossible position of choosing between two paths, both leading inevitably to legal liability.  Customers, almost as a matter of course, will want their transaction completed quickly.  In some of these situations there will be a lien or some adverse claim to the security that the intermediary *could* discover but about which it does not know.  Under the majority's decision, an intermediary will have to take the time to confirm that a customer's securities

---

[33] The official comments explain that the policy of § 8-115 "is similar to that of many other rules of law that protect agents and bailees from liability as innocent converters." O.C.G.A. § 11-8-115 cmt. 2 (noting that "general tort law protects agents or bailees who act on the instructions of their principals or bailors").

47

are unencumbered or otherwise verify that the transaction is not wrongful.  In so doing, the intermediary will fail to follow faithfully the customer's instruction to act expeditiously.  The majority's decision thus places securities intermediaries in the untenable position that the drafters of the Uniform Code—and the Georgia legislature—sought to avoid.

This decision is not, of course, binding on the courts of Georgia or, because my colleagues have determined that its decision should be an unpublished and therefore non-precedential decision, on the United States courts of this circuit.  *See* 11th Cir. R. 36-2.  But nevertheless, its existence will be well-known throughout the securities industry, and its holding will cast a heavy cloud of doubt on stock transactions in Georgia and, because it purports to interpret the Uniform Code, through the United States.  Only the Supreme Court of Georgia, or another panel of this court in a published opinion, can correct the majority's interpretation of § 8-115 and protect securities intermediaries from liability in the absence of a showing of actual knowledge and affirmative misconduct, as intended by the drafters of the Uniform Commercial Code and by the Georgia legislature.  Accordingly, I respectfully dissent.